# The Commonwealth of Pennsylvania *v.* Peter E. Smith.

*Criminal law—Removal of cases to Supreme Court—Certiorari—Constitution of 1874—Act of March 18, 1875.*

The authority of the Supreme Court to remove causes by certiorari from the court of oyer and terminer or quarter sessions has not been taken away by the constitution of 1874, nor has it been affected by the Act of March 18, 1875, P. L. 30, relating to change of venue.

The Supreme Court will not remove by certiorari from the quarter sessions an indictment for bribing a city councilman, where the ground for removal is alleged to be the excited condition of the public mind by reason of inflammatory articles in newspapers, expressions of the district attorney that he anticipated jury fixing, the offering of a reward by a political organization for the conviction of any one for bribing a jury or attempting to do so, and the illegal and irregular course of two judges sitting as committing magistrates in investigating the bribery charges connected with that in the indictment where it appears that two terms have elapsed since the application for the removal was made, and the public excitement about the case has died out.

*Jurisdiction—Judges—Investigation of bribery charges.*

A judge of the quarter sessions, sitting as a committing magistrate or justice of the peace, has no jurisdiction to conduct an investigation of general charges of bribery in connection with city councilmen where there is no definite charge against any specified person, and no affidavit, as provided by the constitution. The legal tribunal for inquiry and investigation, based on rumor, or common report, or general charges, is the grand jury.

In a public examination of charges of bribery of city councilmen, conducted by a judge of the quarter sessions sitting as a committing magistrate and by the district attorney, it is illegal to force from one of the suspected parties, by solemn adjurations and threatening manner, admissions tending to incriminate himself.

Argued April 15, 1898. Petition, miscellaneous docket No. 1, No. 302, by Peter E. Smith, and thereupon rule allowed to show cause why a writ of certiorari should not be granted to bring into this Court the indictments and proceedings thereon, now pending in the court of quarter sessions of the peace, for the county of Philadelphia, to March term, Nos. 355 and 356. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Rule discharged.

The petition of Peter E. Smith, filed in this Court, was as follows:

He is under two indictments in the court of quarter sessions of the peace of Philadelphia county. One of these indictments is to March term, 1898, No. 355, sur charge of bribery. The other indictment is to March term, 1898, No. 356, sur charge of conspiracy. The offense with which he was charged in the first of these indictments is that of bribery and attempt at bribery of a member of the councils of the city of Philadelphia. The offense with which he is charged in the second of these indictments is that of conspiracy to bribe and attempt to bribe a member of said councils of the city of Philadelphia. The petitioner is guiltless of these charges. He has neither bribed nor attempted to bribe, nor conspired to bribe, nor attempted to conspire to bribe any member of the councils of the said city of Philadelphia.

Your petitioner begs that your honorable Court will issue its writ of certiorari to said court of quarter sessions to bring up said indictments, in order that this Court may deal with the same in such a way as will entitle him to secure what is impossible in the present position of affairs in the courts in which said indictments are pending, viz: justice.

Your petitioner avers that such an inflamed condition of public feeling exists in the city of Philadelphia at the present time that it will be impossible for him to be tried fairly and impartially in the courts in which said indictments are pending. In support of his averments to this effect he states the following facts:

1. The charges against him have resulted from an investigation on the part of a committee of the common council of the city of Philadelphia which was charged with the duty of inquiring into allegations which had been made in said council, in the newspapers of the city of Philadelphia, and by public rumor, that an attempt had been made by the petitioner to secure the passage of a certain ordinance which had been pending in said common council, known as the Schuylkill Valley Water Company ordinance, by means of an offer by him to pay money to secure such passage to one Walter Stevenson.

2. Said committee, in pursuance of its duty, met on the 15th day of March, 1898, at which time said Walter Stevenson made the charge against the petitioner of attempted bribery. From that date to the present time, daily, the newspapers of the city

of Philadelphia, in their local and editorial columns, by inflammatory headlines, by equally inflammatory matter, and by other means, have asserted said allegation of bribery against your petitioner, and, also, the fact of alleged corruption of the councils of the city of Philadelphia in connection with the passage of said ordinance. Unfounded rumors and statements have been daily made and circulated in the columns of said newspapers, which have so inflamed the mind of the public in the county of Philadelphia that it is impossible for the petitioner to have a fair and impartial trial at the present time in the courts of said county.

3. The district attorney has acted in such manner in the course of the proceedings leading up to the indictment of this petitioner and subsequently as has greatly tended to further inflame the public mind against the petitioner and also to render impossible a fair and impartial trial. He has done everything in his power to induce the public to believe, without foundation of fact, that the petitioner has instigated and is instigating attempts to do what is called "jury fixing." The statements by the district attorney concerning such alleged jury fixing have been made in such way and manner as will render it exceedingly difficult, if not impossible, to obtain from the members of the jury which will be called, if the threatened trial in the courts of the county of Philadelphia be proceeded with in said courts, a fair and impartial verdict, uninfluenced by fear on their part of being supposed to have been "fixed."

4. On Monday, the 21st of March, 1898, the petitioner, upon notification from the district attorney that a warrant had been issued for his arrest on said charges, surrendered himself and entered bail to appear on Wednesday, the 23d day of March, 1898, before the Honorable JAMES GAY GORDON, one of the judges of the said court who had issued said warrant. At said hearing the petitioner was bound over to appear at the present term of said court by the said Honorable JAMES GAY GORDON and the Honorable F. AMEDEE BRÉGY, who sat with the Honorable JAMES GAY GORDON, as justices of the peace or magistrates.

6. After the petitioner had thus been bound over and after the proceedings therefor had been ended, the said judges continued their sitting and proceeded with what was called "an

investigation " of the charges and rumors which had been made as aforesaid. In the course of said investigation certain witnesses were examined and charges were made and certain proceedings were had, all of which were published in extenso in the newspapers of the said city, whereby said excited and inflamed condition of the public mind was aggravated and such feeling and prejudice were created as greatly to imperil and endanger a fair and impartial trial of the petitioner at the present time in said court. On the following day, in the course of a report of these proceedings in the " Public Ledger," the following is stated:

" This report of the examination gives a very inadequate idea of the dramatic interest of the occurrence, which some of the lawyers present said they considered one of the most remarkable scenes they ever witnessed in a court room. The district attorney and the judges were at times stern and peremptory in their questions, at times almost pleading in their exhortations to the witness to remember his responsibility to his God and himself and tell the whole truth. A part of the time the encouraging remarks addressed by Mr. Graham to the witness, at whose side he stood, were in such a low tone that they could scarcely be heard by any one else. As one of the spectators remarked, at times the scene approached very closely to that of a revival worker bending over a penitent on the anxious bench."

Another of the newspapers, commenting upon the said proceedings, stated:

" Bit by bit Walker weakened. . . . It was a pitiful and painful spectacle of a weak will dominated by a strong one. . . . Walker at last collapsed, although he made spasmodic efforts even then to hide the truth. But he was wholly at the mercy of the district attorney and the judges, and finally became as a child in their hands."

And your petitioner avers that the said Walker was then and there under duress, and by the said judges forced to incriminate himself in violation of the constitution of the commonwealth.

7. The sittings of the said judges were continued from the said 23d day of March to Monday, the 28th day of March, and again on Friday, the 1st day of April. At these sittings or sessions a number of witnesses were examined and proceedings were conducted, all of which were published with newspaper

comments from time to time, said comments and publications being of such character as to greatly aggravate the public feeling and excitement and to render it impossible, as the petitioner believes, for him to be tried according to law at the present time in said court. This so-called investigation thus conducted at the times named was, as the petitioner is advised by counsel and avers, illegal and without legal warrant. There was no power in said judges, who were sitting as justices of the peace ex officio, after the binding over of this petitioner, to take further testimony, and the only effect of the taking of such testimony was to inflame improperly the public mind by disclosures which were communicated to the public in sensational headlines and sensational reports. During the course of this alleged so-called investigation certain statements were made, or alleged to have been made, upon the basis of which a certain person acting as detective for the district attorney, who had no personal knowledge of the facts other than what was disclosed in said proceedings, made an affidavit alleging bribery and corruption of councils in the matter of the passage of said ordinance, against certain persons, one of whom, upon said affidavit, was unconstitutionally held by said judges in excessive bail to the amount of $50,000, which was not only excessive, but was most extraordinary. The effect of demanding such bail by two of the judges of said court upon the public, to which it was communicated by the press in sensational reports, was still further to inflame and excite popular feelings against this petitioner.

8. On Thursday, the 24th day of March, 1898, before any bill of indictment had been found, the bail of the petitioner was notified to produce the petitioner in the court of quarter sessions on Friday, the 25th day of March, 1898, at 10 A. M. On that day and at that hour the petitioner, with his counsel, appeared in said court. The indictment as yet had not been found, but after waiting for some time, the grand jury appeared with some bills of indictment, including the two indictments of the petitioner; the petitioner was thereupon, before having an opportunity to read the bill of indictment, directed forthwith to plead, and it was only after the most strenuous protestation that the petitioner was allowed until Monday, the 28th day of March, to plead to said bills of indictment. On said Monday pleas of "not guilty" were entered to both of said indictments.

Immediately upon pleading, on the same day, the petitioner was again notified that his case would be called on the following day, Tuesday, and he was ordered to be present in court on the following day and be prepared to then stand trial on said indictment.

9. From the moment of his arrest down to that time said petitioner had been most diligent in his efforts to prepare for trial. His efforts commenced before the finding of said indictments. By reason of the large number of witnesses necessary to be called in his defense he was unsuccessful after the most diligent search to find some witnesses essential to his defense. Some witness thus essential prior to the notice of trial had temporarily left the jurisdiction. After the most strenuous and diligent efforts he found it impossible to be ready to proceed to trial on the day named.

10. On Tuesday, the 29th day of March, 1898, the petitioner, with his counsel, appeared in court and moved for a continuance of the trial until the next term of court. The court refused to continue because of the inflamed state of the public mind, and refused to continue because of the inability of the petitioner to produce his witnesses until after the petitioner had been compelled, very greatly to the prejudice of his defense, to testify under cross-examination as to the minutest details of his defense. A continuance was allowed until the next term of court.

11. For the purpose of still further inflaming the public mind against this petitioner, and for the purpose of preventing persons who might be summoned as jurors at the trial of this petitioner from rendering a fair and impartial verdict, and with a view of terrorizing any persons who might be called, through fear of being accused of having been "fixed," a certain quasi public body of the city of Philadelphia, called the Municipal League, caused a reward to be offered of $5,000 to any persons for the detection of any one who would be found guilty of "jury fixing," in connection with the trial of this petitioner. There was no foundation whatever for the insinuation that any jury fixing was contemplated. This petitioner denies any intention of any sort or kind to bring about such "jury fixing." The insinuation was designed to prejudice his trial, and the offering of a reward under the circumstances of the publication con-

nected therewith will accomplish the result of making it impossible to secure jurors who will be willing to render a verdict in accordance with their consciences. The offer thus made and published by the said Municipal League is additionally prejudicial to the petitioner because of the official connection of the said Municipal League with the prosecution of this petitioner and with the so-called "investigation." The district attorney, with a design to further terrorize persons who might be called to act as jurors at the trial of this petitioner, has been daily communicating to the public press, which has reported his utterances to the public, that there is danger of jury fixing, and that the utmost efforts will be necessary on his part to prevent the same. These statements of the district attorney are utterly without foundation. They have been made for the purpose of terrorizing, as hereinbefore set forth. They have, as this petitioner believes, accomplished the result of making it impossible for him to secure jurors who will perform their duty uninfluenced by the fear of being accused thereafter of having been fixed.

12. This petitioner, through his counsel, has been notified that his trial will be called and proceeded with on Tuesday, the 5th day of April, at 10 o'clock, and that he must be ready. He believes that at that time his trial will be forced, and that, despite the state of public feeling which exists, it will be impossible for him to secure any postponement. If his trial is proceeded with at the time threatened, it will be impossible for him to secure a fair and impartial trial, because of the artificially inflamed state of public feeling. Although two courts of quarter sessions will be held on Tuesday next, no notification has been given to the petitioner or his counsel of the court in which the trial will be held, and it is of course impossible for him to subpœna his witnesses to be present in any certain court at the time his case will be called.

13. And your petitioner further avers that one of the said courts of quarter sessions is to be held by one of the judges who sat at the aforesaid illegal investigation, and the petitioner may be forced to trial before said judge who bound him over as committing magistrate or justice of the peace.

14. Your petitioner therefore prays for a rule to show cause why a writ of certiorari should not be issued by your honorable

Court directed to the judges of the court of quarter sessions of the peace for the county of Philadelphia, requiring them to certify the record of said indictments against your petitioner into this court and assign one of the judges of your honorable Court to try the aforesaid indictments. And, further, that all proceedings in the said court of quarter sessions be stayed in the meantime.

The answer of the district attorney was as follows:

It is true that the said Peter E. Smith is under indictment in manner and form as cited in his petition. This respondent denies that there is any inflamed condition of public feeling in the city of Philadelphia at the present time against the said Peter E. Smith, and avers that he can be tried fairly and impartially in the courts in which the indictments are pending. So far as the alleged facts are concerned, which petitioner recites in support of his averments in said petition, respondent would reply as follows:

To the first paragraph, that it is not true as stated therein that the charges against the petitioner have resulted from an investigation on the part of a committee of the common council of the city of Philadelphia, which was charged with the duty of inquiring into the allegations which have been made in said councils, in the newspapers of the city of Philadelphia, and by public rumor, that an attempt had been made by the petitioner to secure the passage of a certain ordinance which had been pending in said common council, known as the Schuylkill Valley Water Company ordinance, etc.; that no allegations against the petitioner in that connection appeared in any of the newspapers of the city of Philadelphia, and this respondent is not aware of any public rumor in that connection against the petitioner whatever, but his arrest grew out of a statement made before a committee of councils by Walter Stevenson, in which it was alleged that the petitioner had offered to bribe him to secure the passage of said ordinance. There may have been rumors and newspaper references upon the general subject of bribery, but nothing whatever relating to the petitioner, except as stated in the answer to the second paragraph hereinafter set forth.

To the second paragraph the respondent answers that he believes a committee of councils met on the day named, and that

one Walter Stevenson made charges against the petitioner of attempted bribery. But that outside of the publication of the testimony taken before that committee no "local or editorial column, by inflammatory headlines or by equally inflammable matter or by other means, have asserted said allegations of bribery against the petitioner." No unfounded rumors or statements have been made as alleged " daily and circulated in the columns of said newspapers " relating to the petitioner.

To the third paragraph respondent answers and says that the district attorney has not acted in any manner calculated to inflame the public against the petitioner and to render impossible a fair and impartial trial, but on the contrary has avoided examinations of witnesses and absolutely refrained from participating in any proceeding that had the slightest relation to the petitioner or his case. And on two different occasions, lest evidence might be adduced bearing upon the case of the petitioner, the district attorney adjourned the hearing and avoided the publication of everything that might affect the petitioner's case.

It is not true, as alleged in the petition, that the district attorney has done everything in his power to induce the public to believe, without foundation in fact, that the petitioner had instigated and is instigating to do what is called "jury fixing." It is true that the district attorney, when interviewed, expressed his fear that efforts had been made to "fix" members of the jury impaneled at the last term of the court. This fear was not expressed without information that fully warranted it. How the publication of this fact can affect the calling of a fair and impartial jury it is difficult to understand. The only effect that could follow such an announcement would be the deterring of persons engaged in this criminal conduct from further pursuing their unlawful work. The respondent states officially that he has reason to believe, and gravely apprehends, that efforts have been and are being made to pervert justice and prevent the selection of a fair and impartial jury to try the petitioner. This respondent has reason to fear, and gravely apprehends, the existence of a corrupt combination bound to defend the petitioner by every means in their power, and who will scruple at nothing to accomplish their purpose, and, if possible, prevent his conviction. In this case the commonwealth

is less powerful by far than the influences which are combined against it.

So far as the fourth, fifth, sixth and seventh paragraphs are concerned, this respondent makes answer, and says that they relate to a matter wholly and absolutely disconnected from the petitioner's case; have no reference to it; no bearing upon it of any kind, and what testimony was elicited at the hearing herein referred to cannot be used in any manner touching the petitioner or his trial, and there was nothing in it calculated to affect the question of the guilt or innocence of the petitioner. His name was not mentioned throughout the proceedings referred to. This respondent does not feel called upon at this time to justify the hearing before the justices of the peace referred to in the petition, but avers that when it is necessary to do so ample authority can be found in the text-books defining the powers possessed by justices of the peace to fully cover the proceeding to which reference is made. The said proceeding was and is entirely lawful.

To the eighth paragraph this respondent answers that, being conscious of the importance of the case against the petitioner, and its relation to the public welfare, and the importance of having it tried and disposed of at as early a date as possible, he gave notice to the petitioner and his counsel that the case would be tried within one week from the date of his hearing before the justices of the peace. That the bail of the petitioner was notified to produce him in court to plead or answer to the indictment. That when the indictment was presented by the grand jury, it was handed to the petitioner and his counsel to read, and he was given from the day when it was so presented, namely Friday, the 25th day of March, until the following Monday to enter his plea. On the following Monday the petitioner pleaded to said bill of indictment the general issue plea of "not guilty." It is true that in accordance with the notice previously served upon the petitioner and his counsel, he was notified that the case would be called for trial on the following day, Tuesday, and he was directed to be present in court on that day.

To the ninth and tenth paragraphs respondent answers that the case was continued upon the application of the petitioner as therein alleged. But as to the other matters alleged in said paragraphs respondent has no knowledge.

To the eleventh paragraph respondent answers that he believes it to be true that a body of public spirited citizens of Philadelphia, known as the Municipal League, has offered a reward of $5,000 for information that will lead to the arrest and conviction of any one found guilty of "jury fixing," with relation to the juries in attendance for the April session of the courts of the quarter sessions of the peace and oyer and terminer and general jail delivery in and for the county of Philadelphia. But it is not true that they have made any such proclamation or offer specifically with relation to the case of the petitioner. Respondent again avers, as an official charged with public duty, that he fears and has good reasons for apprehending that efforts will be made to improperly influence the jury in the case of the petitioner, and this will not only apply here in Philadelphia, but in any county to which the case might be sent. The respondent denies that the offer of reward can have any other effect than that of stimulating watchfulness against such a pernicious work. The Municipal League aforesaid is not connected with the trial of the case against the petitioner, but did furnish counsel to aid and assist the prosecuting attorney in making what the petitioner has called "an investigation of the subject of bribery." The control and management of the case against the petitioner will be absolutely and entirely in the hands of the district attorney and will not be delegated to any other person whatever.

The respondent stamps the statement that "he has been daily communicating with the public press, which has reported his utterances to the public that there is danger of jury fixing, and that the utmost efforts will be necessary on his part to prevent the same," as utterly false and untrue. Respondent never spoke upon this subject but once, and that was at the last term of court, and based upon the information which he had with reference to this subject at that time. That statement was not without foundation, but was fully warranted.

To the twelfth paragraph respondent answers and says that he did notify the petitioner, through his counsel, to be prepared for trial on Tuesday, the 5th day of April, at ten o'clock; that he intended at that time to press earnestly for the trial of the case. This respondent further asserts emphatically that he notified the petitioner, through his counsel, that the case would

be called in the criminal court room known as room 646 ; that the bail notices were issued in addition to the notices to counsel for the petitioner, each one of them containing the information that the case would be called in criminal court room 646.

To the thirteenth paragraph respondent says that he believes one of the judges of the courts of quarter sessions for April term will be one of the judges who sat at a hearing, which, however, was not an "illegal investigation," but a hearing had before two justices of the peace in the exercise of their full and ample power in that respect, to hear the testimony which the commonwealth, through its prosecuting officer, might lay before them, for the purpose of founding the issuance of warrants. This judge will sit in criminal court room known as 676.

In conclusion, this respondent states to the Court that all that he has done with reference to the petitioner's case has been done fairly, and with an eye single, solely to the public good ; that he believes and states officially to the Court that in his judgment the speedy trial of this case is necessary for the protection of the community, and the proper administration of justice ; that he has nothing whatever to say with relation to the rule asked for by the petitioner further than to protest earnestly against the making of any order that will delay this trial.

The respondent would be very glad if one of the judges of this Court, in the exercise of the power with which every justice of the court of king's bench was clothed at common law, and which by statute is possessed by your honors, should see fit to come into court tomorrow and conduct the trial of this cause. The examination of every juror upon his voir dire will fully disclose whether or not he be a competent and impartial juror, and that such an examination will demonstrate that the petitioner can have a fair and impartial trial in this county.

*A. S. L. Shields*, for petitioner.—It is well settled that this Court has jurisdiction and ample power to grant the petitioner the relief for which he prays: Com. v. Balph, 111 Pa. 365 ; Acts of May 22, 1722, secs. 11–13, 1 Sm. L. 139 ; April 13, 1791, 3 Sm. L. 30 ; June 16, 1836, P. L. 784 ; March 31, 1860, P. L. 439, sec. 33 ; Com. v. Nathans, 5 Pa. 125 ; Com. v. McGinnis, 2 Wharton, 113 ; Com. v. Simpson, 2 Gr. 439 ; Com. v. Ickhoff, 33 Pa. 80 ; Com. v. Delamater, 145 Pa. 210 ; King v. Cumberland, 6 T. R. 194 ; 2 Hale, P. C. 215.

The petition and affidavit state facts which, if true, fully warrant the relief prayed for. The answer states no facts whatever. It expressly admits the truth of certain facts alleged in the petition, and its denial of the others amounts merely to an expression of the opinion of the district attorney that the facts stated could not produce the consequences claimed to follow from them. Under such circumstances this Court will accept the facts alleged in the petition as established, and will draw its own conclusions as to their natural and probable consequences: State v. Crafton, 56 N. W. Rep. 257; State v. Nash, 7 Iowa, 347; Jamison v. People, 145 Ill. 357; Bowman v. Com., 27 S. W. 870; Johnson v. Com., 82 Ky. 116; Muscoe v. Com., 87 Va. 460.

All of the proceedings subsequent to the commitment of the petitioner were unconstitutional and unlawful, and the publication thereof by the press in sensational reports influenced and excited popular feelings against the petitioner. To investigate evils on behalf of the community and to make presentment of offenses against the state are functions, not of justices of the peace, nor of the judges of the court of quarter sessions, but of the grand jury acting with or without the guidance of the lower tribunal: 9 Am. & Eng. Ency. of Law, 1, 13; 2 Hale's Pleas of the Crown, 153; 4 Blackstone, 302; McCullough v. Com., 67 Pa. 30; 5 Bacon, Abr. 405; 2 Hale, P. C. 46; Wells, Jurisdiction, sec. 40; 2 Bacon, Abr. 626. In determining whether the amount of bail is excessive or not the principal considerations that should influence the court are the gravity of the offense and the severity of the punishment: Ex parte Tayloe, 5 Cow. (N. Y.) 39; Ex parte Hutchings, 11 Tex. App. 28; Ex parte Banks, 28 Ala. 89; U. S. v. Lawrence, 4 Cranch C. C. 518.

*George S. Graham,* district attorney, contra, filed no printed brief.

OPINION BY MR. JUSTICE MITCHELL, April 25, 1898:

The authority of this Court to remove causes by certiorari from the courts of oyer and terminer or quarter sessions is not now open to question. It was held in Com. v. Balph, 111 Pa. 365, that the power which had existed for a century and a half before 1874 was not taken away by the constitution of that date. That case was followed in Com. v. Delamater, 145 Pa.

210 where it was said by a unanimous court that the question was settled.

It is suggested by the learned district attorney that the remedy by application for change of venue under the Act of March 18, 1875, P. L. 30, has superseded the necessity of the exercise by this Court of its authority by certiorari. There is much force in this suggestion as to all cases to which that act applies, but the act does not take away our jurisdiction. That remains unaffected, though the occasions for its use are made fewer. The power itself is for exceptional cases only, and it will always be an important consideration in our practice under it whether an application should not be first made to the court in which the case is pending for such relief as that court may be competent to give. The petitioner's case however being that of an untried indictment for what, serious as the crime is, is technically a misdemeanor, does not fall within the terms of that act.

The petitioner asks us to remove the indictments against him into this Court, on the ground that the popular excitement against him is such that he cannot, at least now, obtain a fair and impartial trial. This popular excitement is averred to be shown, and in large part to have arisen from the action of the councils of the city of Philadelphia, upon certain bills for the leasing of the gas and waterworks; from charges of corruption made in regard to the efforts to pass the latter bill, and the action of a committee of common council appointed to investigate such charges; from the reiterated, exaggerated and inflammatory accounts of these proceedings published in the newspapers; from the public efforts of the district attorney and of a body of citizens called the Municipal League to induce the public to believe that an effort would be made by or in behalf of the petitioner to "fix" the jury; from the unusual haste and urgency in bringing on the trial of these indictments; and lastly from the influence of the proceedings in a so-called investigation by two of the judges of the court in which the indictments were pending and liable to be tried.

It is not necessary to discuss in detail these various averments or the evidence in support of them. We are not disposed to think that the action of councilmanic committees produces any great excitement in the public mind. Nor do

we find in the action of the district attorney in regard to the anticipated " jury fixing " anything that calls for criticism.   If in possession of information that led him to fear such an attempt he would naturally and properly do everything in his power to prevent and counteract it.   And it would be his duty to be alert even though the signs were small and the danger more in apprehension than in reality.   Jury fixing, so called, is an exceedingly rare crime.   The gain from the attempt is too doubtful and the risk too great ever to make it common.   In trials that involve matters of great public interest, juries will be liable to be somewhat swayed by the popular excitement that pervades the community from which they are drawn.   But the corruption of individual jurors in individual cases is of the very rarest occurrence.   The action of the Municipal League was somewhat indiscreet in its specific direction towards the petitioner, as it appears to have been somewhat credulous on the general subject, but we are not convinced that it has produced any popular excitement or terrorism of jurors from which the petitioner is in danger.

The urgency with which the indictment was pressed to trial, and the inflammatory style of the newspaper reports on the subject may be considered together as the two causes in combination which certainly produced at the time of the filing of the petition a prima facie appearance of menace to the petitioner's right to an impartial trial.   But speed in pushing offenders to trial is not in itself unfair or unjust.   On the contrary it is in the interest of the public.   The most important element in the prevention of crime is the certainty of punishment, and next to that is the speediness of it.   And an early trial is also in the interest of the innocent accused, provided fair and reasonable time is allowed him for preparation, by finding his witnesses, getting ready his evidence, etc.   The petitioner's case was pushed with unusual celerity, but a continuance was granted him until the next term, though this was more liberal in appearance than in reality, as the term was at its end and he was in fact notified that he would be called for trial in one week.   Subsequent events have enlarged this time at least to the term following.

The newspaper accounts were certainly highly inflammatory and, had the trial taken place at the time first fixed, might

have had a prejudicial effect on the petitioner, though there is very great force in the argument of the district attorney, which our experience confirms, that in a community so large and so diverse in habits and pursuits as this, there is seldom any real difficulty in getting a jury on whom newspaper accounts or comments have made no impression. But even aside from this, newspaper influence on any question, though very potent at the time, is necessarily short-lived. They make it so themselves. In the restless hunt for sensations with which to harry the public mind, novelty is the most essential element. Excitement cannot be kept long at boiling point. Yesterday's sensation is superseded by today's which will in turn be crowded out by tomorrow's.

The last specification of the elements of the alleged inflamed condition of popular feeling is the course of proceeding in the so-called investigation, and it is the most serious of all we have had to consider. It appears that charges being made against the petitioner a warrant was issued, and he appeared before two of the judges of the court of quarter sessions sitting as committing magistrates or justices of the peace. After a hearing, he was bound over to answer at the then present term of court. This was the legal termination of the proceeding, but the two judges then went on to examine other witnesses and to conduct what has been called an "investigation" into the general subject of the bribery in councils charged in connection with the said water bill. This proceeding was wholly without legal authority. There was no definite charge against any specified person, still less any affidavit subscribed by the affiant as required by the constitution. The high official and personal character of the judges conducting it cannot make up for the want of jurisdiction. They were not sitting as judges of the court of quarter sessions, but in their ex officio capacity of justices of the peace, and their acts must be tested by exactly the same standard as if they had been the acts of any police magistrate or justice of the peace throughout the commonwealth. It is needless to say how soon such an officer would be checked if he undertook any such proceeding. The legal tribunal for inquiry and investigation, based on rumor, or common report, or general charges, is the grand jury, as its official name indicates, the grand inquest of the commonwealth inquiring for the

county of Philadelphia, and its jurisdiction and methods are such as to afford ample security to the public interest without the sacrifice of individual rights.

The investigation was at times as illegal in manner as it was defective in jurisdiction. A witness being put on the stand under oath hesitated before answering questions which led directly to incriminating himself, and was addressed from the bench " Look at the court, and with your responsibility to your God, tell us the truth," and then a hesitating answer, followed by the command from the district attorney, " Quick, don't stop to think about it. You know. Now make a clean breast of it," and then again the judge " Tell the whole story. You owe it to yourself and to your country to tell it." The witness, after a pause, " Well "—the judge " Look this way—look at me. Who was it? Answer the question." And later on the district attorney " You might as well tell me now, because before you leave the stand I am going to have it. You might as well begin now and tell me the whole story. . . ." By the judge, " Why do you hesitate? A. I have to think. Q. Why? . . . . Now why do you ask for time to think? You know who influenced you. Who was it? " And again the district attorney " When was the money paid? You might as well tell it first as last; " and so on through the examination. A weak and uninstructed man, without counsel, was in the powerful hands of a learned and able district attorney, and the judges, whose duty was to sit in impartial judgment upon the charges against him, joined in forcing from him an admission of his guilt. The examination of Lewis J. Walker before this self-constituted tribunal reads less like a proceeding in a Pennsylvania court of law than like a page from the recent trial of M. Zola which shocked the sense of justice of the civilized world.

It will not do to say that these proceedings were in the interest of the public for the exposure of a great wrong. We have not the least doubt that they were in good faith so intended, and many very worthy people may think them justified for that reason. But they were none the less illegal, and it is none the less our duty to say so with emphasis. No man, even for the accomplishment of a great good, can be permitted to set himself above the law, and least of all the judge appointed to administer it. The French or Continental system of putting on

the witness stand the person to whom the evidence or even suspicion points, and there subjecting him to an inquisitorial examination by the judges, as well as by the prosecutor, has very great and manifest advantages for the detection and punishment of crime. It may be said that the escape of a guilty person from such an ordeal is practically unknown. But the system carries with it such danger to innocence and to individual liberty that it has never been tolerated in the common law of England and America, and has been expressly prohibited by safeguards written into every constitution of this commonwealth since 1776. The temptation to disregard them in the public interest is not new, nor without precedents, though the latter are happily few and not recent. Nearly ninety years ago, a very brilliant and able judge, though somewhat lacking in judicial calmness of judgment, issued a warrant for the arrest of a supposed counterfeiter who was likely to escape before a sworn affidavit, as required by the constitution, could be prepared. The constable refused to execute the warrant, and was indicted and convicted for failure in official duty. In this Court the argument was made that is now suggested that the constitutional restrictions were not intended to be impediments in the way of justice and, therefore, exceptions must be permitted, but the judgment was unanimously reversed, and in the opinion, Chief Justice TILGHMAN, one of the wisest and most careful judges who ever adorned any bench, said: " The expressions of the constitution are very plain and very comprehensive. But it has been contended that the public safety requires that they should be subject to some exceptions ; that in case of necessity the oath may be dispensed with ; and that the magistrate who issues the warrant must be the judge of that necessity. It appears to me that if this be the true construction, the provision in the constitution is a dead letter, because in every instance the magistrate who issues the warrant would say that he thought it a case of necessity. It is true that by insisting on an oath, felons may sometimes escape. This must have been very well known to the framers of our constitution, but they thought it better that the guilty should sometimes escape than that every individual should be subject to vexation and oppression." Conner v. Com., 3 Binn. 38. To show that if constitutional requirements are disregarded, the danger of such

oppression is not merely theoretical, it is only necessary to refer again to the trial of Zola in one of the most enlightened nations of the world, and under a republican form of government.

Nor is it any answer in the present case to say that the proceedings complained of were after the petitioner's binding over, and therefore only concerned others. They were continued by adjournment from time to time until the day before that set for the petitioner's trial, and in asking on that day for a temporary suspension of the investigation, the district attorney publicly assigned that trial as the reason, thus connecting the two matters closely in the popular mind, to which they were brought home by large headlines and extended reports in the newspapers.

From the foregoing review of the case we think it clear that, when the petition was filed and this rule granted, there was a well-founded appearance of serious menace to the petitioner's right to a fair and impartial trial, and if the conditions had continued we should unhesitatingly award a certiorari. But the circumstances have materially changed. The time that has now elapsed has been sufficient to allow any undue excitement of the public mind to abate or be transferred to new subjects; the case can no longer be said to be urged to trial with unfair haste, as it is conceded by the district attorney that it cannot be tried before the next term; and the most serious menace of all, the apprehension, probably not really justified at any time, that it might be forced to trial before one of the judges sitting in the investigation, and thus the two matters be liable to be confused in the jurors' minds, has passed away. The petitioner does not ask that the case should be sent to another county for trial, nor do we think any sufficient ground has been shown that it should. All that we could do therefore if we brought the record here would be to hold it until such time as an impartial jury could be drawn in this county and then send it down for trial before one of the judges of the court of quarter sessions not heretofore connected with the case. We are of opinion that these objects have already been attained by the proceedings upon this rule, and that there is no necessity for further action on our part.

Rule discharged.