Philadelphia Gas Works Company *v.*
Philadelphia et al.

Argued May 23, 1938.   Before MAXEY, DREW, LINN, STERN and BARNES, JJ.

326

328

330

332

334

336

338

340

*Wm. Clarke Mason,* with him *Thomas B. K. Ringe* and *Morgan, Lewis & Bockius,* for petitioner.

*G. Coe Farrier,* with him *Herman N. Schwartz,* Assistant City Solicitors, and *Joseph Sharfsin,* City Solicitor, for respondents.

OPINION BY MR. JUSTICE LINN, June 30, 1938:

Two matters are for consideration: first, is this a case of which the court should take original jurisdiction? If it is, a second question must be answered: shall the injunction be granted?

The Philadelphia Gas Works Company asked the court to take original jurisdiction[1] in an emergency produced by threats publicly made by the Mayor of Philadelphia followed by his Proclamation, in effect, declaring forfeiture of property rightfully in petitioner's possession and his intention to seize it and exclude petitioner therefrom, with force, if necessary. The petition was filed on the morning of December 31, 1937, following reported public declarations alleged to have been made by the Mayor, to the effect that he would on that day take possession of petitioner's property. Petitioner gave notice to defendants that the petition would be presented and that application for a rule to show cause and for a restraining order would be asked for. Counsel

---

[1] Pursuant to Article V, section 3, Constitution of Pennsylvania: *Wheeler v. Philadelphia,* 77 Pa. 338, 344; *Wentz v. Philadelphia,* 301 Pa. 261, 151 A. 883; *Wilson v. Philadelphia,* 319 Pa. 47, 179 A. 553; *Kelley v. Baldwin,* 319 Pa. 53, 179 A. 736; *Turco P. & V. Co. v. Kalodner,* 320 Pa. 421, 184 A. 37; *Kelley v. Earle,* 320 Pa. 449, 182 A. 501.

for the petitioner in the presence of the city solicitor, who had accepted service on behalf of defendants, appeared before a majority of the members of the court and formally presented the petition. Counsel for both sides were heard. When the hearing began the Mayor had not yet issued his Proclamation, but before the hearing was concluded, the Proclamation was promulgated. A rule to show cause why the court should not take original jurisdiction of the proceeding was granted, with an order restraining defendants from interfering with plaintiff's property *pendente lite;* defendants were directed to answer and the application was set down to be heard January 6, 1938. Defendants filed an answer from which it appeared at the argument that issues of fact were raised. The court accordingly referred the petition and answer, together with plaintiff's bill in equity, which had been made part of the petition, as the suit of which the court was asked to take original jurisdiction, to Honorable THOMAS D. FINLETTER, President Judge of Court of Common Pleas No. 4 of Philadelphia County "to hear the evidence, determine the facts, make findings thereon and report to this court."[2] The learned judge, with characteristic care and thoroughness, heard the parties and the evidence[3] presented by them and prepared his report. Though not required to do so by the order of reference, he exhibited his report

---

[2] "Now, January 6, 1938, the within petition and answer are referred to the Honorable THOMAS D. FINLETTER, President Judge of the Court of Common Pleas No. 4, of Philadelphia County, to hear the evidence, determine the facts, make findings thereon and report to this court. The restraining order made by this court in the above entitled case on December 31, 1937, shall continue in effect until the final disposition of the motion by this court. The bill in equity and the injunction affidavits filed in the above entitled case shall likewise be referred to President Judge FINLETTER for such action as this court shall further direct."

[3] The proceedings before him occupy 902 printed pages of the record and we are advised by one of the briefs the hearing occupied approximately three weeks.

to the parties with leave to file exceptions. Defendants filed exceptions[4] which, after hearing, were dismissed; his report, together with his action on the exceptions, was then filed in this court. Defendants were directed to file an answer to the bill which had been made part of the petition, and the entire proceeding was ordered for argument May 23, 1938. Counsel were informed that argument would then be heard on the whole case, i. e., on the rule to show cause why original jurisdiction should not be taken of the cause set forth in the bill and also on the merits of the bill and the answer to it; this procedure was adopted because the bill in equity contained the same averments as the petition for the rule, so that there was no reason why two arguments should be heard, one on the rule and one on the bill and answer. The case was then fully argued and has since been duly considered; all the members of the court who heard the argument agree that the rule should be made absolute and that, on the merits of the bill and answer, an injunction[5] should be granted as prayed for.

The petitioner and plaintiff is the Philadelphia Gas Works Company, assignee of the United Gas Improvement Company, lessee.

The defendants are The City of Philadelphia, a Municipal Corporation; S. Davis Wilson, Mayor; Martin J. McLaughlin, Director of Public Works; Andrew J. Emanuel, Director of Public Safety; and Edward Hubbs, Superintendent of Police.

The averments of the petition and bill on the one hand, and of defendants' answers to the petition and to the bill on the other, sufficiently appear in the excerpt from President Judge FINLETTER's report, contained in the

---

[4] We have considered the brief filed on behalf of defendants with the learned judge, a copy being supplied at the argument.

[5] Compare *Cooke v. Boynton*, 135 Pa. 102, 19 A. 944; *Easton Pass. Ry. Co. v. Easton*, 133 Pa. 505, 19 A. 486; *Tide Water Pipe Co. v. Bell*, 280 Pa. 104, 124 A. 351; *Sterling v. Constantin*, 287 U. S. 378.

Reporter's Statement of the case, attached to this opinion.

The subject of the litigation is the possession and operation of the Philadelphia Gas Works which, briefly, is a plant for the manufacture and distribution of gas to residents of Philadelphia. "The gas works," as MITCHELL, J., said, in *Baily v. Phila.*, 184 Pa. 594 (1898), "are the property of the city of Philadelphia, not as a municipality, but as a business corporation."[6]

By a lease or operating agreement the United Gas Improvement Company (hereafter called the Improvement Company) had possession of and operated the Gas Works during the thirty-year term beginning in 1897 and ending December 31, 1927. Pursuant to city ordinance of February 5, 1926, a new lease[7] or agreement was made by the City and the Improvement Company, for the period beginning January 1, 1928, but without fixing any definite term. The Improvement Company, with the approval of the City, in December, 1927, assigned the lease to petitioner, Philadelphia Gas Works Company. Clause 1 is in these words: "City does hereby lease to Gas Company, on the terms and conditions herein set forth, from and after January 1, 1928, all the property real and personal, collectively known as the Philadelphia Gas Works, it being understood and agreed that Gas Company shall pay any and all ground rents and the rental of any land, building or buildings, which may be used in connection with the operation of the Gas

---

[6] Various aspects of the ownership and operation of the Gas Works have been the subject of litigation from time to time: *Western Saving Fund Society v. Philadelphia*, 31 Pa. 175 and 185 (1858); *Wheeler v. Philadelphia*, 77 Pa. 338 (1875); *Baily v. Philadelphia*, supra; *Ferguson v. Public Service Commission*, 82 Pa. Superior Ct. 238 (1923); *Wilson v. Public Service Commission*, 116 Pa. Superior Ct. 72, 176 A. 510 (1935).

[7] The Public Service Commission, pursuant to the statute then in force, duly issued its "Certificate of Public Convenience", approving said contract. See Public Service Commission's Municipal Contract Docket No. 3475.

Works; and also pay all water rents or other charges for water which shall be used by the lessee upon the leased premises or any part thereof. All the foregoing payments shall be included as part of the operating expenses as herein provided.

"The City does hereby authorize and empower Gas Company during this lease to retain possession of, maintain, change, alter, replace, repair and operate said Gas Works and appurtenances and all the property hereby leased; to lay, repair, remove, relay, extend and maintain mains, pipes, services and appurtenances along and beneath the surface of the highways, streets, avenues, lanes, alleys, ways and public places in said City, for the supply and distribution of gas; and Gas Company during this lease shall have the exclusive right for said purposes to enter upon and occupy all said highways, streets, avenues, lanes, alleys, ways and public places, and to supply and distribute gas through pipes laid therein: . . .

"City agrees that during this lease it will do nothing, by ordinance or otherwise, which will in any way interfere with or limit, restrict or impair this exclusive right hereby vested in said lessee, or the use and enjoyment of any of the property hereby leased, or such renewals, alterations, replacements, enlargements, additions, extensions, betterments or improvements as may be made thereto."

Clause 2, paragraphs A and B, dealt with the City's right to terminate in these words: "A. City shall have the right to terminate this lease on December 31, 1937, or at the expiration of any ten-year period thereafter by serving upon the President or Vice-President of Gas Company at least eighteen (18) months prior to the date fixed therein for termination, a written notice of the City's intention to so terminate this lease, duly signed by the Mayor or executive head of the City pursuant to an ordinance of City Council and by serving a similar notice upon any assignee of this lease: *Provided,*

*however,* That said notice shall have the effect of terminating this lease only in the event and upon the condition that on or before the date fixed therein for termination, the City shall pay the Gas Company a sum or sums of money equal to the amount of expenditures made by Gas Company for betterments,[8] extensions, improvements and additions to Gas Works in respect of which it has not already been reimbursed.

"B. Gas Company shall have the right to terminate this lease on December 31, 1937, or at the expiration of any ten-year period thereafter, by serving upon the Mayor or other executive head of the City at least eighteen (18) months prior to the date fixed therein for termination, a written notice of the intention of the Gas Company, to so terminate this lease, duly signed by the executive officers of Gas Company, and such notice shall have the effect of terminating this lease on the said date fixed therein for termination, and the City shall thereupon take possession of the Gas Works.

"Upon any such termination of the lease by City or Gas Company, City shall have the option to purchase all coal, coke, tar, lime and other gas-making supplies and residual products then on hand at said Gas Works at the then market prices, or to have the said Gas Company remove the same at its own cost and expense as soon as can conveniently be done. All gas theretofore sold to consumers and not as yet paid for and all gas in the holders, mains and pipes of said Gas Works at any such termination of this lease by City or Gas Company shall be accounted for at holder cost by City to Gas Company when paid for by consumers and the City agrees to use all due diligence in the collection thereof: *Provided, however,* That if the Gas Company has already been reimbursed out of gas receipts or otherwise for any of the above, then it shall pass to the City upon such termination without any cost.

---

[8] The decision turns on the existence or non-existence of a debt due by the City on this account.

"Upon the termination of this lease in manner as aforesaid, Gas Company shall deliver to City the property herein leased, in the same good order and condition in which the same now is, and to such extent as said property shall not have been altered or changed under this lease by the additions, extensions, betterments and improvements made in and about the manufacturing and distributing systems and plants during this lease, and together with all such renewals, alterations, replacements, enlargements, additions, extensions, betterments or improvements to said Gas Works and the acquisition of additional property; together with the right to use all processes of every kind useful in the manufacture of gas then established and in use in any of said works; all of which shall be so delivered to City in good order and condition at such termination of this lease.

"All the changes, alterations, constructions, removals and repairs which shall be made from time to time in the proper maintenance, extension, betterment and improvement of the said Gas Works shall be made and done by Gas Company, and City shall receive the same, together with the said plants in an efficient state at such expiration of this lease, without any charge or cost to the City, except as herein provided. It is the intent of this lease that City, at the end of the term shall without charge or cost, except as herein provided, receive all of the said Works in the condition of alteration, improvement and change in which the same shall then exist, and the same shall be so maintained as to be then in good order and condition."

On or about March 13, 1936, the Mayor, pursuant to ordinance of council, notified the Gas Works Company of the City's intention to terminate the lease December 31, 1937.

It is at this point in the transaction that the essential difference between the parties appears. The Gas Works Company denied the efficacy of the notice and asserted that the City's right to terminate was conditioned on

payment to the Company of sums expended by it for betterments and additions to the plant.[9]

On the other hand, defendants admitted the conditional character of the City's right to terminate but insisted that "no sums were due to the Philadelphia Gas Works Company for such advances and expenditures," and that accordingly the termination was effective.

If nothing was due on the account specified, the termination became effective December 31, 1937; but if anything was due on that account, the City's intention to terminate was ineffective without payment.

Obviously, such an issue, one would think, could and would readily be determined by examination of the accounts required by the contract to be kept and which had, from time to time, throughout the years, been audited by the City's accountants.[10]  Instead of so determining it, what do we learn from the record?  The Mayor insisted that the Gas Works Company was indebted to the City in a large sum composed of claims asserted under a number of headings; these claims he incorporated in the answer by reference to a pending proceeding in equity brought by the City in Court of Common Pleas No. 4, asking for an accounting based on the same claims.  We quote from paragraph 15 of the answers stating defendants' position in this respect: "That, in addition to the said items of surcharge set forth in the Controller's Reports, as hereinbefore referred to,

---

[9] Pursuant to part of Clause A, quoted above: *"Provided, however,* That said notice shall have the effect of terminating this lease only in the event and upon the condition that on or before the date fixed therein for termination, the City shall pay the Gas Company a sum or sums of money equal to the amount of expenditures made by Gas Company for betterments, extension, improvements and additions to Gas Works in respect of which it has not already been reimbursed."

[10] President Judge FINLETTER's report says: "As a matter of fact the City had as much knowledge of the subject as the Company.  Its auditors had been working on the books for weeks." The evidence clearly supports that statement.

there are other sums due to the said City by the said Philadelphia Gas Works Company, all of which are specifically set forth in a certain Bill of Complaint filed by the City of Philadelphia against the United Gas Improvement Company, [and others] . . . in the Court of Common Pleas No. 4, as of December Term, 1935, No. 6464, which action is now pending and in which the City seeks an accounting of and to recover the amounts set forth in the surcharges appearing in the said Controller's Reports and for the further causes set forth in the said Bill of Complaint. A copy of the said Bill of Complaint is appended hereto, marked Respondents' Exhibit 'C' and made a part hereof."

The City's equity proceeding, asking for an accounting, had not been tried (though under the rules, ample time for trial had passed) when the present proceeding began. Whether the existence of the asserted indebtedness to the City would have constituted a reason for not accompanying the termination notice with payment for betterments and additions, within the terms of the lease, need not now be decided because President Judge FIN-LETTER, in his report, specifically finds that when the notice was given March 16, 1936, nothing was due on account of those claims made by defendants in their answer to the petition or in the bill filed in Common Pleas No. 4, but that, on the contrary, the City was indebted to the Gas Works Company, and that on December 31, 1937, the amount due under the betterments clause was $288,179.70.

In view of a contention made in argument on behalf of the City, to be referred to later in this opinion, another fact about the trial of that equity suit may be stated now. The parties agreed, as we understand the record,[11] that the trial to be conducted by President Judge FINLETTER to enable him to report to this court, should also be regarded as the trial of the equity suit

---

[11] See page 177a et seq. of Volume 1, Transcript of Testimony.

pending in that court to the extent that evidence received in either could be relevant in the other. This was an appropriate agreement because the averments in defendants' answer to plaintiff's bill now before us, set forth the same facts in defense as were set forth in the City's bill in that case as the basis of the accounting decree against the Gas Works Company sought by the City in that suit.

The effect of determining the issue of fact against the City, i. e., whether the City was indebted on an account required to be paid as a condition of terminating the lease as of December 31, 1937, was to leave the Gas Works Company in possession with the duty of continuing the operation of the plant as provided in the lease.

On December 31, 1937, the Mayor, in keeping with his threats to take possession of and operate the Gas Works, issued a Proclamation containing the following: "WHEREAS; There is not now existing[12] any legal contract or lease providing for the operation of the Philadelphia Gas Works and there is no Councilmatic authority to operate the same after midnight today; and

"WHEREAS: Article VI, section 3 of the City Charter Act provides that the Department of Public Works 'shall have the care, management, administration, and supervision of water-works, gas-works, and other public utilities (except as otherwise provided in this act) owned or controlled by the City the supply and distribution of water and gas,' etc.; and

"WHEREAS: The said United Gas Improvement Company and/or its wholly owned subsidiary the Philadelphia Gas Works Company has no legal right[13] to continue in possession of the Philadelphia Gas Works,

---

[12] Whether or not there was an existing contract was not a matter for the Mayor's decision; as has appeared, his decision was wrong.

[13] In this conclusion the Mayor's decision was also without foundation.

city-owned property, after midnight, December 31, 1937; and

"WHEREAS: Any interference with the manufacture or the furnishing of gas to the consumers of Philadelphia would be a castastrophe, especially to four hundred thousand home-owners, to manufacturing and industrial plants and to mercantile establishments, and would prevent the gas lighting of the public highways, and

"WHEREAS: Failure to properly light the highways and homes would encourage lawlessness and might result in possible loss of life and injury to persons and damage to property;

*"Now, Therefore,* I, S. Davis Wilson, Mayor of the City of Philadelphia, recognizing that a condition has arisen requiring me as Mayor to declare a State of Emergency in the City of Philadelphia under the authority vested in the Mayor of the City of Philadelphia by the City Charter Act, Article II, section 6(d), 'The Mayor may, upon any emergency or apprehension of riot or mob, take command of the police force, and appoint as many special patrolmen as he may deem advisable. During their service the special appointees shall possess the powers and perform the duties of regular employees of the Department of Public Safety, and shall recive such compensation as shall be authorized by the Mayor, not exceeding that of the regular officers of the force performing corresponding duties,' as of twelve o'clock noon, December 31, 1937.

"Pursuant to such authority, I do hereby establish and issue the following orders and regulations to be effective during the period of emergency:

"1. I declare all property of the Philadelphia Gas Works, including credits, cash, cash income and all other assets, real or personal, to be the property of the City of Philadelphia, and to be under the supervision and control of the legally designated governmental agencies and officers who are hereby authorized to re-

ceive, maintain, operate and hold them for the benefit of the City of Philadelphia, subject to proper disposition.

"2. The present employees of the Philadelphia Gas Works Company, necessary for the proper protection, maintenance and operation of the said Gas Works are hereby designated as temporary employees of the City of Philadelphia and said employees are required to act for the City during the present emergency under the proper municipal supervision.

"3. All payments to the United Gas Improvement Company for management fees, reimbursements for losses resulting from the sale of appliances and payments for any other useless and extravagant purposes will be terminated as of twelve o'clock midnight today in accordance with the terms of the existing lease which terminates at midnight, December 31, 1937.

"4. All payments to the Koppers Coke Company at the present exorbitant contract rates are hereby discontinued and any gas furnished by the Koppers Coke Company during this emergency shall be subject to a rate to be fixed by law with the approval of the Public Utility Commission of Pennsylvania.

"5. During the emergency period there shall be a sequestration of all funds and property of the Philadelphia Gas Works Company subject to a proper audit.

"6. In view of the fact that no gas rate has been fixed effective January 1st, 1938, I further Proclaim that the retail rate for gas shall be fifty cents per one thousand cubic feet pending a rate to be fixed either by City Council or by the Public Utility Commission of Pennsylvania.

"7. Savings realized from the eight hundred thousand dollar management fee, the million dollars difference in gas cost between the Koppers Coke Company and manufacture of gas in the City-owned plant, and approximately six hundred thousand dollar loss from the sale of appliances and charged to the consumer, will

permit compensation of all necessary employees of the Gas Works to be increased five per cent.

"8. I call upon all citizens of Philadelphia to coöperate with the Mayor and duly constituted municipal officers in the establishment, during the emergency, of gas manufacture in the municipally owned plant, assuring them that every protection will be provided for peaceful and efficient operation for the benefit of the gas consuming public."

In their answers to the petition and to the bill, defendants aver (and it will be observed that the averment is of present intention and therefore not responsive to plaintiff's definite averment of the Mayor's intention on December 31, which may therefore be regarded as unanswered)[14]: "It is denied that S. Davis Wilson, Mayor of the City of Philadelphia has any intention of taking possession by physical force of the Philadelphia Gas Works, but it is averred that he is asserting a technical possession[15] of the said Philadelphia Gas Works so as to protect the rights of the City of Philadelphia in the said property and its rights to recover mesne

---

[14] A statement made by an assistant city solicitor during the hearing before President Judge FINLETTER may indicate why the answer is not more responsive to the averment: "Therefore when it came time to file our answer in this case I dictated it. I stated the facts as I knew them of my own knowledge and I believe, although I don't know, that the Mayor never had any intention *vi et armis* of seizing this plant."

[15] An extract from the testimony may show what defendants meant by the phrase "asserting a technical possession." "Q. Now, Mr. Wood, you don't mean to say that as consultant of the City of Philadelphia, paid by the Mayor, that you never discussed with him the operation of the gas works when he took it over? A. The only time he ever had any discussion with me in that respect was on December 31, 1937, when he called me to his office and asked me if I would be prepared if it was necessary to take over the operation of the gas works as of midnight of that night and I said I could. A few hours later he told me it would not be necessary." We assume that the time "a few hours later" referred to a time after the restraining order was issued.

profits in any action of ejectment that may be instituted for its possession, and so as not to permit or allow by acquiescence in the claims of the Complainant, the accrual of rights or privileges on the part of the said company, in detriment and prejudice to the rights, powers and interests of the said City.

"Respondents are advised by counsel and therefore aver that they are entitled to institute an action of ejectment and other remedial process to establish the said rights of the City of Philadelphia to the possession and control of the said Philadelphia Gas Works and that under Article I, Section 6, of the Constitution of Pennsylvania, the said City, as owner with rights of possession of the said property, is entitled to a jury trial of all disputed facts with respect to its right to possession of the said premises and that any action taken by your Honorable Court, pursuant to the petition filed in the present case would deny to the City the equal protection of the law and deprive it of its property without due process, in violation of the Fourteenth Amendment to the Constitution of the United States and also of the aforesaid Article I, section 6, of the Constitution of Pennsylvania."

Now, not only was the Mayor's threatened conduct generally unlawful, but the record shows that, in endeavoring to take possession of the Gas Works, December 31, 1937, he was proceeding in direct opposition to the action of the legislative branch of the City Government. On December 30, 1937, the Mayor was informed in writing that on December 29, 1937, City Council had "passed over the veto of the Mayor by a vote of yeas, 16; nays, 6" an ordinance, therefore disapproved by him, directing him "to execute and deliver on the part of the City, a lease or contract with The Philadelphia Gas Works Company . . . for the lease to said Company of the Philadelphia Gas Works for a term beginning January 1, 1938" in a form contained

in and made part of the ordinance, a certified copy of which accompanied the written notice to him.

We accept the findings of fact made by President Judge FINLETTER; we find them supported by evidence in the record; many of them result from the issues raised by defendants' reliance as a defence in this case on the averments made as a basis of the accounting sought in the equity suit in Common Pleas No. 4. We quote the following findings:

"(a) That S. Davis Wilson intended to take possession of the Works by force.

"(b) That reserves to meet future and contingent liabilities were properly set up and were not excessive.

"(c) That a balance of $288,179.70 was due by the City to the Company for betterments and additions to the plant, and was not paid.

"(d) That such payment not having been made the lease was not terminated and is still in force.

"(e) That the Company is not indebted to the City or to the Gas Rate Fund.

"(f) The City cannot now object to the Koppers contract because it expressly, and after long and careful examination, authorized it to be made.

"(g) The rate of interest in capital investment was fixed by the lease at seven per cent to the City on the value of the plant, and six per cent to the Company on its capital invested.

"(h) The pensions to employees on the basis of their experience and skill were properly paid.

"(i) That sound judgment required advertisements and propaganda to obtain New Business.

"(j) That sale of tar processed into Ugite resulted in high profits, and that there is no proof that more could have been made by other disposition of the tar. And that the Company owes nothing on this account.

"(k) That the charges for servicing street lamps were reasonable and approved by the Gas Commission and

the City, and that the Company owes nothing to the City on that account."

In the circumstances disclosed by the record this is such an extreme case as to make it the duty of the court to take original jurisdiction; the cases cited above leave no doubt of the authority; the rule to show cause will accordingly be made absolute.

Coming now more particularly to the case presented by the bill and answer, it is to be noted, as has been said, that the bill is in substance a restatement of what is contained in the petition for the rule, and that the answer to the bill is, in substance, a restatement of the answer to the petition. What has been said of one is therefore applicable to the other. We can reach no other conclusion than that plaintiff is entitled to the equitable relief prayed for. The defendant Mayor's threats, culminating in his Proclamation repeating them under color of his office, and in direct contradiction of the ordinance of Council passed over his veto December 29, 1937, exhibited such disregard for law that it was necessary immediately, in granting the rule to show cause on December 31, 1937, also to restrain defendants from taking any of the threatened steps to interfere with plaintiff's peaceful possession and operation of the Gas Works pending the determination of the rule. Defendants not only proposed to trespass on property lawfully in plaintiff's use and possession, and by the ordinance passed by Council on December 29th intended to remain in its possession, but also to exclude plaintiff therefrom; they threatened a continuing trespass. The record sufficiently shows the character of plaintiff's operations and the necessity of supplying, without interruption, enormous gas consumption required by residents of Philadelphia, to indicate the probable magnitude of damage resulting to plaintiff and to residents of the city if the threatened trespass were not restrained. Equity will enjoin such conduct; *Tri-Cities Water Co. v. Monessen,* 313 Pa. 83, 85, 169

A. 159 (1933) ; *Gray v. Phila. & Reading Coal & Iron Co.,* 286 Pa. 11, 16, 132 A. 820 (1926) ; *Kramer v. Slattery,* 260 Pa. 234, 238, 103 A. 610 (1918).

Returning now to the last quotation made from the defendants' answers to the petition and the bill, a word may be said in rejecting the suggested contentions that by taking jurisdiction and enjoining defendants, they are deprived of a jury trial and, in another aspect of the proceeding, are also deprived of due process; in this connection defendants refer to the fourteenth amendment to the federal constitution. Defendants' position seems to be, first, that the City had a remedy of which it was deprived, to sue for its real property in ejectment and have a jury trial; second, that the effect of our decision on the bill and answer will be to control Court of Common Pleas No. 4 in making its final decree in the City's equity suit in that Court. We have already referred to the agreement of the parties that both cases should be regarded as heard together by President Judge FINLETTER. That City's argument is that, as his findings of fact in the suit in No. 4 Court will probably be the same as those reported to this Court under the order of reference, if we now accept the findings reported to us, the judges of Common Pleas No. 4 will be constrained to follow the views of this court expressed in the decree now to be made; in other words, that the judges of the court below will accept President Judge FINLETTER's findings because we have accepted them. That result may follow and properly, too; but it does not support the contention of want of due process. Due process is as much required by the state constitution as by the fourteenth amendment and, as we understand it, is, for circumstances such as are now presented, defined in the same terms. This court has ample power now, if such action were deemed advisable,[16] to remove the equity suit into this court and dis-

---

[16] See section 13 of the Act of 1722, 1 Sm. L. 131, reprinted in note to 17 PS section 41, p. 16; the Act of June 16, 1836, P. L.

pose of it without waiting for its further consideration by the learned judges of Common Pleas No. 4. But we have not considered that step necessary because defendants themselves made their bill in that case part of their answer in this. We refer to the subject only to show that if our disposition of the proceeding of which we have taken original jurisdiction happens to dispose of a proceeding involving the same issues pending below, defendants are not deprived of due process; apart from our undoubted power to bring the record here by certiorari and dispose of it, defendants themselves elected to submit their claim here.

Nor is there any merit in the other objection that the city has been unconstitutionally deprived of a jury trial. Ample ground appears, as has been shown, for the intervention of equity. It was the acts of the Mayor[17] that required equitable intervention; the solution of the dispute involved a complicated accounting, a subject particularly appropriate for a chancellor (indeed made cognizable in equity by statute) and seldom treated to

---

784, 17 PS section 41 and cases cited in notes to that section, among them, *Com. v. Smith,* 185 Pa. 553, 40 A. 73 (1898); *Quay's Petition,* 189 Pa. 517, 42 A. 199 (1899); *Schmuck v. Hartman,* 222 Pa. 190, 194, 70 A. 1091 (1908); *Shafer v. Cascio,* 288 Pa. 56, 61, 135 A. 639 (1927); *Carbon County Judicial Vacancy,* 292 Pa. 300, 302, 141 A. 249 (1928); *Messmore's Estate,* 293 Pa. 63, 141 A. 724 (1928); *Rimer's Contested Election, Geary's Appeal,* 316 Pa. 342, 345, 175 A. 544 (1934).

*Wentz v. Philadelphia,* 301 Pa. 261, 151 A. 883 (1930), was an original proceeding transferred to this court from the common pleas.

[17] "It is a serious mistake to suppose that municipal officers are above the law, and can enforce civil rights, or perform even police duties, in their own way, in disregard of the forms of law. The officers of a municipality, from the mayor down to a police officer, are as much bound by the law as a private citizen, and have no license to transgress the law in the enforcement of the law": *Easton Passenger Ry. Co. v. Easton,* 133 Pa. 505, 521, 19 A. 486.

the satisfaction of either party by a jury.[18] "Equity is the special forum for obtaining an injunction, which may be granted to prevent actual or threatened trespasses or nuisances of a continuing and permanent character . . . and, when once the jurisdiction has thus attached, equity will itself proceed to round out the whole circle of controversy, by deciding every other contention connected with the subject-matter of the suit, including the amount of damages to which plaintiff is entitled because of injuries theretofore sustained." *Gray v. Phila. & Reading Coal & Iron Co.*, 286 Pa. 11, 16, 132 A. 820. "By the Act of February 14, 1857, P. L. 39, enlarging section 39 of the Act of June 13, 1840, P. L. 666, 671 . . . the courts of common pleas are expressly given equitable jurisdiction in matters of account. This is not affected by Article I, section 6 of the state Constitution, which provides that 'trial by jury shall be as heretofore and the right thereof remain inviolate.' If the jurisdiction of courts of equity in matters of accounting was held to have been taken away by that provision, and such actions were required to be brought in courts of law, then 'trial by jury' would be extended beyond the realm of the 'heretofore,' and this the Constitution does not require." *Schwab v. Miller,* 302 Pa. 507, 510, 153 A. 731.

In *Tide Water Pipe Co. v. Bell,* 280 Pa. 104, it was said: "Being of opinion that plaintiff's title to the right-of-way has not been lost, we may, in order to round out the whole circle of controversy between the parties *(McGowin v. Remington,* 12 Pa. 56, 63; *Hurst v. Brennen* (No. 1), 239 Pa. 216), so decree in this case; even though, but for defendant's wrongdoing, the question of title would have been cognizable only in a court of law *(Wilhelm's App.,* 79 Pa. 120; *Pennsylvania Co. v. Ohio River Junction R. R. Co.,* 204 Pa. 356, 367); . . ."

---

[18] In its equity suit, the city expressly asked for an accounting; p. 42 of the answer to petition.

The court is greatly indebted to President Judge FIN-LETTER for his valuable assistance in complying with the order of reference.

### DECREE.

Now, June 30, 1938, after hearing the parties by their counsel and after considering the record, it is ordered, adjudged and decreed, for the reasons stated in the opinion of the court this day filed in the cause, that the defendants, City of Philadelphia, S. Davis Wilson, Mayor of the City of Philadelphia, Martin J. McLaughlin, Director of Public Works of the City of Philadelphia, Andrew J. Emanuel, Director of Public Safety of the City of Philadelphia, and Edward Hubbs, Superintendent of Police of the City of Philadelphia, and their subordinate officers, patrolmen, servants and agents and each of them and their successors in office, and all those acting or claiming to act under their authority, be and they are severally restrained and enjoined from taking any steps whatsoever to interfere with the peaceful possession by The Philadelphia Gas Works Company of the Philadelphia Gas Works and every part thereof until the lease dated February 8, 1926, described in the record as the lease under which that possession is held, is properly and legally terminated.

The defendants shall pay the costs.

The Chief Justice and Mr. Justice SCHAFFER did not hear the argument and did not participate in the decision.