480 A.2d 1012

Russell G. and Dorothy MOORE, Samuel A. and Eleanor Lewis, Charles F. and Mary Dolby, Robert J. and Evelyn Parson, James E. and Patricia Burkholder, and Mary B. Larsen

v.

MOBIL OIL COMPANY, Elmer K. Custer, Jr., Russell A. Custer and Irvin Custer, Individually A/T/A Custer's Garage and Custer's Garage, Inc.

Appeal of MOBIL OIL COMPANY.

Joseph CARLIN and Dorothy Carlin

v.

MOBIL OIL COMPANY and Elmer K. Custer, Jr., Russell A. Custer and Irvin E. Custer, Individually and T/A Custer's Garage and Custer's Garage, Inc.

Appeal of MOBILE OIL COMPANY.

Donald L. and Marlene F. BIEBER

v.

Elmer K. CUSTER, Jr., Russel A. Custer, and Irvin E. Custer, (Individuals), Custer's Garage, Inc. (A Corporation Organized Under the Laws of Pennsylvania), and Mobil Oil Company (A Corporation Organized Under the Laws of New York).

Appeal of MOBIL OIL COMPANY.

Joseph and Lois WHITMAN and Yolanda Duke

v.

MOBIL OIL CORPORATION and Elmer K. Custer, Jr., Russel A. Custer and Irvin Custer, Individually A/T/A Custer's Garage and Custer's Garage, Inc.

Appeal of MOBIL OIL CORPORATION.

Russell G. MOORE, Dorothy Moore, Samuel A. Lewis, Eleanor Lewis, Charles F. Dolby, Mary Dolby, Robert J. Parson, Evelyn Parson, James E. Burkholder, Patricia K. Burkholder and Mary B. Larsen

v.

MOBIL OIL COMPANY and Elmer K. Custer, Jr., Russell A. Custer, Irvin Custer, Individually and Trading as Custer's Garage and Custer's Garage, Inc.

242

Appeal of Elmer K. CUSTER, Jr., Russell A. Custer, Irvin E. Custer and Custer's Garage, Inc.

Joseph CARLIN and Dorothy Carlin

v.

MOBIL OIL COMPANY and Elmer K. Custer, Jr., Russell A. Custer, Irvin Custer, Individually and Custer's Garage and Custer's Garage, Inc.

Appeal of Elmer K. CUSTER, Jr., Russell A. Custer, Irvin E. Custer and Custer's Garage, Inc.

Donald L. and Marlene F. BIEBER

v.

MOBIL OIL COMPANY and Elmer K. Custer, Jr., Russell A. Custer, Irvin Custer, Individually and Trading as Custer's Garage and Custer's Garage, Inc.

Appeal of Elmer K. CUSTER, Jr., Russell A. Custer, Irvin E. Custer and Custer's Garage, Inc.

Joseph and Lois WHITMAN and Yolanda Duke

v.

MOBIL OIL COMPANY, Elmer K. Custer, Jr., Russell A. Custer, Irvin Custer, Individually and Trading as Custer's Garage and Custer's Garage, Inc.

Appeal of Elmer K. CUSTER, Jr., Russell A. Custer, Irvin E. Custer and Custer's Garage, Inc.

Superior Court of Pennsylvania.

Argued Sept. 6, 1983.

Filed June 22, 1984.

244

Joseph F. Moore, Jr., Philadelphia, for appellant (at Nos. 2259, 2260, 2261 and 2262) and for appellee (at Nos. 2269, 2270, 2271 and 2272).

William H. Kinkead, III, Norristown, for appellants (at Nos. 2269, 2270, 2271 and 2272) and for appellees (at Nos. 2259, 2260, 2261 and 2262).

Mark D. Turetsky, Norristown, for appellees Moore, Lewis, Dolby, Parson, Burkholder, Larsen, Whitman and Duke.

Before ROWLEY, POPOVICH and MONTGOMERY, JJ.

MONTGOMERY, Judge:

The instant appeal arises from an Order by the lower court, sitting en banc, which denied the Appellants' exceptions to a Decree Nisi. The lower court adopted the Chancellor's Decree Nisi as its Final Decree. This action was initiated by the Appellee landowners to seek equitable relief as the result of the contamination of the Appellees' ground water supplies.

The factual record, which is substantial in this case, shows the following:[1] The Appellants, Elmer J. Custer, Jr., Russell A. Custer and Irvin E. Custer had for many years operated, as a partnership, a service station and garage in the Village of Oaks, in Montgomery County. The Custers purchased their petroleum products from the Appellant Mobil Oil Corporation, which was also the owner and lessor of the underground tanks in which the Custers stored the gasoline sold in their station.

---

1. The findings of fact of the chancellor who heard the testimony without a jury, which are subsequently approved by the court en banc, are entitled to the weight of a jury's verdict; such findings are controlling unless they lack evidentiary support or it is evident that the chancellor capriciously disbelieved the evidence. See *Hankin v. Hankin*, 279 Pa.Super. 179, 196, 420 A.2d 1090, 1099 (1980). We rely on the Chancellors' findings in relating the facts in the instant case.

On Monday, July 16, 1979, Elmer K. Custer, Jr. opened the service station, which had been closed the prior two days. He pumped ten to eleven gallons of gasoline into the vehicle of the first customer of the day, when for no apparent reason the flow of gasoline from the pump ceased. He immediately checked the gasoline storage tank which serviced his pumps. This tank, which had a 4,000 gallon storage capacity, was "manifolded" to another 2,000 gallon underground tank. The system operated so that the smaller tank fed into the larger one. When he checked the tank with a "dip-stick", he concluded that it was empty.

Elmer K. Custer, Jr. promptly called the police because he suspected possible foul play. The prior weekend had been announced as a period for a state-wide shutdown of gas stations by an independent gasoline dealers' association. On Friday, July 13, 1979, when the shutdown was scheduled to begin, Elmer Custer received a telephone call from an anonymous caller who asked if Custers' station would be open that day. After Elmer answered in the affirmative, the caller stated that he would not recommend that it be opened. During the hearings before the Chancellor, a witness unrelated to the parties testified that late in the evening on Friday, July 13, 1979, he observed a man standing next to a silver colored petroleum tanker truck parked in the driveway of the Custers' station. He further testified that he did not observe any logo on the side of the tanker, but did see a hose running from the center of the tanker into the ground at the area of the intake for the underground tanks. Russell Custer testified that he could not recall any time during his thirty years in business when he had received a shipment of gasoline from a tanker truck with no logo, nor could he recall ever receiving a delivery in the evening.

Records maintained by the Custers indicated that as of July 13, 1979, their tanks should have contained 3,338 gallons of fuel, plus or minus ten to twenty gallons. They promptly notified Mobil of the loss of gasoline and on July 17, 1979 two Mobil employees visited the station. These

representatives also confirmed the absence of fuel in the tanks by dip-stick measuring them. They also discovered that the Custers did not maintain appropriate records in regard to the fuel, and were not aware that there was a state law (See 35 P.S. § 1181), which required a daily reading of the tanks by a dip-stick measurement. It had been the Custers' practice to make such a measurement only once a week. The Custers instead calculated the amount of fuel they had in storage on a daily basis by taking a reading from gauges on each pump which indicated the amount of gasoline dispensed through that pump each day. From these readings, figures were derived which were tallied on a daily inventory sheet, although it was conceded by Elmer Custer that the dials on the gas pumps only registered how much fuel came out of the tanks and did not accurately indicate how much fuel remained in the tanks, between weekly dip-stick readings.

In an effort to determine the manner in which the approximately 3,300 gallons of fuel were lost or stolen from the Custers' station, Mobil had one of its field engineers test the tanks by filling them with water and then taking periodic measurements. By various measurements between July 18, 1979 and July 23, 1979, the engineer determined that some three inches of water had escaped, indicating that the 4,000 gallon tank was a "leaker". He recommended to Mobil that because of a possible leak, and also because the tanks were then 25 to 30 years old, they ought to be removed. Other evidence showed that the same engineer tested the 4,000 gallon tank, with water, for a period of approximately one month, and the tank showed an approximate loss of over one foot and three inches of liquid.

It appears that the 4,000 gallon tank as well as the connected 2,000 gallon tank were removed from the ground on August 22, 1979. Several of the individuals who were present at that time and who visually inspected these tanks agreed that the only hole in them appeared to be near the top of the 4,000 gallon tank. One witness testified that the hole was about the size of a quarter to a half dollar. Those

who testified agreed that the tank was rusted and pitted with corrosion. A representative from the Pennsylvania Department of Environmental Resources ("DER") characterized the tank as being in "poor shape, fair to poor shape." In response to questions during the course of hearings conducted by the lower court, witnesses acknowledged that even a careful examination of the tanks might not discover small holes that caused a leak, and that such small holes could expand, causing gasoline leakage, because of pressure exerted by the weight of fuel against the walls of the tank.

Also introduced in proceedings before the lower court were copies of notes taken by a claims adjuster for Mobil. In those notes, the Mobil representative indicated that he and an expert hired by Mobil in connection with this problem traveled around the area of the Custers' station and located two other nearby service stations, which are identified as the Arco and Sunoco stations. The notes reflect that the expert concluded that because of their distance from Custers' station, it was doubtful that the other two stations were responsible for the contamination which occurred.

The actual effects of gasoline contamination in well water in the area had been noticed by residents in the area as early as November, 1978. Residents of homes which were located down a hill and on either side of the Custers' Mobil garage began noticing a change in the quality of their well water at that time, and some stated that it had an odor of gasoline. This change prompted the filing of complaints with the DER. That agency began sampling and testing the well water at eighteen separate locations in the Village, all in the general area of the Custers' facility. These samplings began before the reported loss of fuel at the garage and continued until July 23, 1980. Not all of the wells were tested on each occasion of testing. Of the wells tested on August 22, 1979, four wells showed no gasoline contamination, whereas four wells had gasoline infiltration ranging from 1.5 to 20.0 parts per million. In testing on

November 9, 1979, December 18, 1979 and April 3, 1980, three wells were not contaminated, yet nine had levels detected in the range from .8 to 20.0 parts per million. Samples taken on April 10, 1980 and July 23, 1980 showed that ten had no trace of gasoline, but nine registered petroleum pollutants ranging from .4 through 13.0 parts per million.

There was no evidence introduced of a particular state or federal standard establishing the level at which petroleum pollutants may be present in a water supply. However, proof was presented that a DER agent wrote to a resident in the area that while a small amount of petroleum product in well water might not be considered an eminent health hazard, it would make the water obnoxious to taste or smell, and therefore "unusable or undrinkable." The DER representative further stated that any amount of gasoline or petroleum product in the water "should label that water as polluted."

As a result of the problems in their water supply, the Appellees filed Complaints in trespass and equity against the Appellants in the Court of Common Pleas of Montgomery County. In all of the Complaints, the Appellees sought relief in the form of compensatory and punitive damages, as well as the implementation of the court's equitable powers to abate and remove a nuisance. In the latter regard, the Appellees sought an injunction to restrain the Appellants from handling or mishandling gasoline so that it entered the source of the Appellees' water. While admitting that Mobil was the owner of the storage tanks located at Custers' service station, none of the Appellants admitted any of the other material allegations of the Appellees' complaints. Thus, they denied that they caused or permitted gasoline to leak, spill or otherwise escape from the storage tanks, denied that they had acted in a reckless, negligent or careless manner, and denied that they had failed to inspect, maintain, supervise or correct conditions, or to recover and control gasoline after any spillage, leakage, or loss at Custers' station so as to prevent its escape into the ground

and thereby contaminate the Appellees' water supply. In all ways, each of the Appellants denied liability or the responsibility for payment of damages under any theory of recovery. Each maintained that no gasoline had escaped from the tanks in question to invade the Appellees' properties and to contaminate their water source. In New Matter, each of the Appellants sought indemnification from the other Appellants on theories of implied and/or expressed indemnity or precepts of trespass and assumpsit.

On November 21, 1980, counsel for the Appellees, in a petition for mandatory injunction, demanded relief including:

(a) That Defendants be restrained and enjoined from further polluting the Plaintiffs' wells; (b) that a mandatory injunction be issued ordering Defendants to go upon the Plaintiffs land and gather, capture, filter, or otherwise remove from Plaintiffs' wells the gasoline found therein in such a manner as not to cause further damage to Plaintiffs' properties; (c) that Defendants, upon proof of same, be ordered to pay an amount of money necessary to place Plaintiffs' land in the condition that it was prior to the improper conduct of Defendants, to pay any amount of money necessary for the replacement and/or repair of Plaintiffs' properties and to pay a reasonable sum of money to Plaintiffs for Plaintiffs lose [sic] of use and enjoyment of said land; (d) that Defendants upon proof of same, be ordered to pay an amount of money reimbursing Plaintiffs for all costs and expenses including a reasonable attorney fee for the expenses they have incurred as a result of Defendants' conduct; (e) such other relief as the Court deems proper and just under the facts as presented.

On December 16, 1980, the Appellees obtained an order of court setting January 5, 1981 for a hearing on the question of whether or not a preliminary mandatory injunction should be issued, pending a final hearing in the case. On December 22, 1980, a praecipe for civil trial list bearing the signatures of the counsel for both sides was filed, indicating

that the case was in all respects ready for trial, but stipulating that discovery could continue until the case was listed for trial. Subsequently, interrogatories were filed on behalf of the Appellants, which had been answered by some of the Appellees. In addition, depositions were taken of the Custers, two Mobil representatives, and of the operators of the Sunoco and Arco stations situated in the vicinity of the Custers' Mobil garage.

A hearing commenced before the lower court on February 6, 1981. Since the cases involved similar matters of proof, counsel for the various Appellees consolidated their efforts. They asserted that they planned to present evidence that the Appellants had polluted the Appellees' wells with gasoline, and that there was enough evidence to justify the granting of equitable relief by the court. It is noteworthy that there was a consensus expressed among all involved in the hearing that the proceeding would deal with whether the Chancellor at that time could grant the "mandatory preliminary injunction" requested by the Appellees, and that the hearing would not involve questions leading to the calculation of damages claimed by the Appellees. The preliminary injunction hearing in this case consumed three days of testimony and generated a transcript of 523 pages. All of the Appellees who testified described their well water as being unpalatable and odoriferous. These conditions existed despite the fact that some had installed charcoal filtration or water softeners. Appellees also testified that they had experienced itching, dry skin, hives, and other problems as a result of use of the well water, and related that they had been forced to limit their use of such water to such things as flushing toilets and washing vehicles. They further related that their dishes and fixtures had become stained. Many described the odor as that of gasoline. In order to deal with these problems, some of the Appellees had to resort to the purchase of elaborate equipment or potable water, while others relied upon friends or relatives to provide them with water.

A number of witnesses testified concerning the issue of the source of the pollutants. As noted earlier, testimony came from employees of Mobil which indicated that the 4,000 gallon tank was a "leaker", and that the surface of it was corroded and could be perforated without effort by an object such as a car key. As assistant professor of environmental science at Pennsylvania State University, who was hired by the Appellees, collected samplings from the wells and conducted tests on the samples. This witness testified that while he could not say for sure whether the 3,300 gallons of fuel at Custers' facility was lost at one time or over a long period, he nonetheless believed that there was gasoline coming from that source. Further, he related that based upon his observations, tests, discussions with other experts, and other information, he did not believe that the gasoline had flowed into the Appellees' water supplies from either the Arco or the Sunoco station. His conclusion was also based upon consideration of the terrain, the purported nature of the underground water table, and some rather inconclusive chemical testing.

An expert hired by Mobil to conduct his own investigation also testified. While it is clear that he took issue with some of the conclusions drawn by the Appellees' witness, as described above, he also affirmed that during his investigation, he had reached a conclusion that it was "doubtful" that the Arco and Sunoco stations were responsible for the contamination due to their distance from Custers' garage, and because no house in between their locations and the Custer location had reported well problems.

After concluding these hearings, the Chancellor decided to issue no preliminary injunction. Instead, he held settlement conferences with the parties. On February 26, 1981, after it appeared that attempts to settle the case would be unsuccessful, the Chancellor entered an order that a final hearing on the request for injunctive relief would take place on March 13, 1981. The Appellants filed various motions, including requests for discovery, for a continuance of 120 days, and for clarification of the Order setting the March

13, 1981 hearing. The Chancellor denied these motions. At the subsequent hearing, at which only Russell A. Custer appeared on behalf of the Appellants, the Chancellor issued findings of fact and conclusions of law in support of a Decree Nisi. That Decree, inter alia: (1) permanently enjoined the Appellants from polluting the ground and the ground water in and about the vicinity of the Appellees' wells; (2) ordered the Appellants to take such measures as might be necessary to assure that the gasoline and other contaminants presently in the soil and ground water as a result of the leakage from underground gasoline tanks in Custers' garage would not pollute the Appellees' wells; (3) required the Appellants to submit a comprehensive proposal to supply the Appellees with safe and potable water for domestic use, with such proposal to be prepared in consultation with Appellees' expert consultant, with requirements that reports be submitted to the court concerning such efforts; and (4) directed the Appellants, "as a means of mitigating damages", to provide the Appellees with an alternative supply of safe and potable water for domestic use.

The Appellants proffered over 300 exceptions in proceedings before the lower court, all of which were dismissed by the court en banc. Nine contentions of error are presented for our consideration in this appeal. We are constrained to find merit in several of the points raised by the Appellants.

■ We first address the Appellants' complaint that the Chancellor improperly ordered, *sua sponte*, that the March 13, 1981 hearing be a "final hearing for injunctive relief" and improperly denied them the opportunity to engage in further discovery prior to that hearing. It does not appear that the Pennsylvania Rules of Civil Procedure specifically dictate when a final hearing must be held subsequent to a preliminary hearing on a request for an injunction. See *Duggan v. 807 Liberty Avenue, Inc.*, 447 Pa. 281, 290, 288 A.2d 750, 755 (1972). Rule 1531(f)(1) makes it clear that a final hearing may be granted upon the demand of the

defendant after the issuance of a preliminary injunction.[2] However, the Rules do not establish any authority for a lower court to act, *sua sponte*, to order a final hearing.

In *Hatalowich v. Bednarski*, 315 Pa.Super. 303, 461 A.2d 1292 (1983), our Court recently reviewed a case in which the court entered an order of non pros *sua sponte*. It was held that the court's order was in error because Rule of Civil Procedure 1037(c) only authorizes the court to enter such an order "on motion of a party". Similarly, in *Edward M. v. O'Neill*, 291 Pa.Super. 531, 436 A.2d 628 (1981), this Court held that the trial court acted improperly in issuing an injunction *sua sponte*, when none had been sought by the plaintiff. The same conclusion as to the lower court's *sua sponte* order for a final hearing is mandated in the instant case. Our finding of error is also compelled by the apparent possibility that the Appellants may have been prejudiced by the lower court's denial of Appellants' requests for further discovery and a delay in any final hearing on the injunction. Thus, we can only consider the lower court's action as being valid, from a *procedural view only,* up to the time it denied a preliminary injunction after the initial hearings.

■ As a procedural matter, we could therefore remand this case for further proceedings, since it would ordinarily not be our practice to review a dispute involving such a preliminary order. However, because it is clear that there are other serious substantive problems regarding the lower court's order in this case, we cannot serve justice by merely remanding on procedural grounds and ignore the fact that the lower court en banc affirmed obviously improper actions by the Chancellor. All such matters are covered by exceptions filed by the Appellants in the lower court and by arguments they have raised on this appeal. It is appropriate that we address these problems at this time.

**2.** For interesting guidance in this area, see *School District of Pittsburgh v. Pittsburgh Federation of Teachers,* 486 Pa. 365, 374, 406 A.2d 324, 328 (1979).

■ In our evaluation of the propriety of the Chancellor's order, our foremost concern is that he issued an injunctive order mandating significant affirmative conduct by the Appellants. It must be recognized that a mandatory preliminary injunction is an extraordinary judicial act and should be issued only in rare cases, and certainly more sparingly than an injunction which is merely prohibitory. *Shanaman v. Yellow Cab Co. of Philadelphia*, 491 Pa. 516, 421 A.2d 664 (1980); *Roberts v. School Board of the City of Scranton*, 462 Pa. 464, 469–70, 341 A.2d 475, 478 (1975). The court must exercise extreme care and act in only the clearest of circumstances. *Roberts v. School Board of the City of Scranton, id.*, at fn. 4.

■ It is with such concepts in mind that we have reviewed the record. Our independent examination leads us to the firm conclusion that there were no apparently reasonable grounds for the court to conclude, with the requisite assurance necessary for the issuance of a mandatory injunction, that the Appellants' gasoline tanks were the cause, or especially the sole cause of the contamination of the Appellees' ground water supplies. This finding by the lower court was clearly speculative in the absence of any evidence of leakage testing of the similar tanks used by the other gasoline stations in the same area. It simply cannot be determined with assurance that either or both of those facilities were not the source or partially the source of the petroleum pollution. The conjectural nature of the lower court's finding as to the Appellants' culpability for the contamination does not permit us to sustain the issuance of an extraordinary mandatory injunctive order in this case.

■ It is also apparent that two particular aspects of the lower court's mandatory order are legally improper, even if one were to find validity in the lower court's conclusion that the Appellants were responsible for the contamination of the Appellees' wells. First, the court's order that commanded the Appellants to cease polluting the Appellees' grounds and ground water was inappropriate because the evidence showed that the Appellants had already removed

the tanks which were allegedly the source of the leakage and replaced them with new ones. One cannot imagine any further steps the Appellants could take to assure no further seepage of their petroleum into the ground. Since the possibility of continuing seepage was thereby prevented, the court had no reasonable basis for including such a mandate in its order.

■ Second, we must hold improper that part of the lower court's order requiring that the Appellants implement measures necessary to assure that the gasoline and other contaminants *already in the soil and ground water* did not *continue* to pollute the Appellees' wells.[3] It is evident from the evidence of record that a workable and scientifically proven solution to the problem of continued subsurface seepage of gasoline already in the ground into the Appellees' water supply is uncertain.[4] The only alternatives

3. The court ordered the Appellants ". . . to take such measures as may be necessary to assure that the gasoline and other contaminants *presently in the soil and ground water* as a result of the leakage from the underground gasoline tanks in Custer's Garage does not pollute plaintiffs' wells." (emphasis added).

4. Section 839 of the Restatement (Second) of Torts is directed to the liability of a possessor of land for a nuisance—a nontrespassory invasion of another's interest in the private use and enjoyment of land—caused while he is in possession, by an abatable artificial condition on the land. It appears applicable here, particularly in recognition of the pertinance of Comment f, and Illustration 1 thereto, which explain what is meant by the words "abatable physical condition":

"*f. Abatable physical condition.* By an 'abatable physical condition' is meant one that reasonable persons would regard as being susceptible of abatement by reasonable means. The law does not require the unreasonable or fantastic, and therefore even though it might conceivably be possible to abate a particular condition, it is not 'abatable' within the meaning of this Section unless its abatement can be accomplished without unreasonable hardship or expense.

*Illustrations:*

1. A is in possession of land upon which is situated a tank for the storage of petroleum. B is in possession of land 500 yards from this tank. Without A's knowledge or negligence the tank develops an underground leak and a quantity of oil flows out, saturates A's land and drains into an unknown subterranean stream that carries it to B's land. As a result, B's well that supplies his drinking water

offered by the parties gave no guarantees of success. It is clear that the lower court has therefore required the Appellants to take action that appears to be impossible to accomplish. We cannot affirm such an order.

We are certainly troubled by the great inconvenience and significant harm which has been visited upon the Appellees by the reprehensible pollution of their potable water supplies. The constant difficulty and hardship of living with this condition cannot be ignored or minimized. However, our cognizance of their plight does not lead to the conclusion that the lower court's clearly excessive and improper exercise of equitable powers should be affirmed.

This matter should have been certified to the law side of the court. The harm suffered by the Appellees can be fully remedied by an award of damages. In that regard, we note that the lower court's order requires the Appellants to provide the Appellees with potable water supplies. Yet, the record shows that most or all of the Appellees had already been procuring their own safe water supplies for a significant time prior to the initiation of this litigation in the lower court. The Appellees could be adequately compensated through an award of money damages for both actual expenses they incurred in such efforts as well as for any inconvenience involved in the process, both before and after the date of the hearings in the lower court. Likewise, they can be fully compensated by receiving damages for the loss in the value of their properties, homes, and water supplies, as well as for the harm and inconvenience they have suffered in the past and may suffer in the future. The availability of an adequate remedy at law makes it clear that equitable relief of the type granted by the lower court should have been withheld.

is polluted and rendered unfit for use. When A learns of this he immediately removes all the remaining oil from the tank but the oil already in his land continues to pollute B's well for some time. It is found that A's maintenance of the oil tank was not abnormally dangerous. A is not liable to B for failing to take action to remove the oil already in his land, since it would not be practicable to do so.

The Order of the lower court is reversed and this case is remanded to the lower court with directions that it be certified to the law side of the court for further proceedings.

Jurisdiction is Relinquished.

POPOVICH, J., files a dissenting opinion.

POPOVICH, Judge, dissenting:

Inasmuch as I take issue with the factual and legal conclusions drawn by the Majority, in particular that the lower court had "no apparently reasonable grounds" for finding that the "Appellants' gasoline tanks were the cause ... of the contamination of the Appellees' ground water supplies ...", (Majority's Opinion at 1019), I have prepared a detailed accounting of what transpired below in support of my position.

Viewing the evidence in compliance with the applicable standard of review, *see Zvonik v. Zvonik*, 291 Pa.Super. 309, 435 A.2d 1236 (1981), the following appears of record: On Monday the 16th of July, 1979, Elmer K. Custer, Jr., opened, as he had for the past 32 years, the Mobil station for business, which he owned in partnership with his two brothers, Russell A. Custer and Irvin Custer. The station was closed that Saturday and Sunday, the 14th and 15th of July. This was the weekend the independent dealers' association had called for a state-wide shut down of gas stations.

In servicing the first customer of the day, Elmer had pumped 10 to 11 gallons of fuel into the vehicle when, for no apparent reason, the flow of gasoline from the nozzle stopped. Immediately, Elmer "dip-sticked" the 4,000-gallon underground tank, which, in turn, was "manifolded" to another 2,000-gallon underground tank, and "it was empty." This prompted Elmer to notify the police because that Friday the 13th, when the independent gasoline retailers were scheduled to go on strike, he received an anonymous call wanting to know if he would be opened that day. After

he answered, "We expect to be," the caller, according to Elmer, said, "Well, I don't recommend it."

A few days following the incident, a John H. McDermott, after hearing about the matter at work, stopped and informed Elmer that, at approximately 11:30 p.m. on the 13th of July, he had been driving past the station on his way home when he observed (and proceeded to describe) a man standing next to a silver colored tanker truck parked in the driveway. Although the mercury lights were on at the station, McDermott did not observe any logo on the side of the tanker, but he did see a hose running from the center of the tanker into the ground near the intake cap for the underground tanks. Further, Russell Custer could not recall, during his 30 years of business, receiving a shipment from a tanker truck with no logo, or, since the business was not opened nights, a delivery in the evening.

Mobil Oil Corporation, the owner and lessor of the underground tanks, was notified of the purported loss (theft) of gasoline. The Custers' records indicated that as of July 13, 1979 the tanks should have contained 3,338 gallons of fuel, plus or minus 10 to 20 gallons. (RR. 712a) As a result of the unexplained loss, on the 17th of July, 1979, Mobil personnel (John Woolfolk—sales representative and Arnie DiFlorio—field engineer) went to the site. After confirming the absence of fuel in the tanks by "sticking" them, DiFlorio discovered from the dealer (Elmer) that there were "no records on location" in regard to the fuel. (RR. 355a) In fact, Elmer admitted that he, along with his two brothers, had no idea that the law required a "daily" reading of the tanks by "dip-sticking" them. *See* 35 P.S. § 1181. It was the Custers' practice to "dip-stick" the tank once a week.[1] (RR. 320a, 708a & 739a) The Custers' procedure for calculating the amount of fuel on hand consisted of taking the "totalizer readings" from the pumps (consisting

---

1. "Dip-sticking" or "sticking" is the procedure of placing a stick, with numbers calibrated in feet and inches on its face, into the opening (filter holder) atop an underground tank. Thereafter, the stick is removed and where the "wet mark" is across the stick is used to tabulate the amount of gasoline remaining in the tank. (RR. 325a)

of three to dispense the gasoline) at the open and close of business, and subtracting the evening readings from the morning readings. (RR. 322a & 701a) These figures were then transferred to a daily inventory sheet (manila envelope). (RR. 324a & 701a) However, Elmer conceded that the dials on the gas pumps only registered how much fuel came out of the tanks and "don't give the total of the gasoline in the tank[s.]" (RR. 332a) In other words, it was "presumed" that the estimation of fuel in the tanks (3,300 gallons at the close of business on Friday the 16th of July, 1979,) was correct. (RR. 334a & 370a)

It is to be noted that since the 2,000-gallon tank was "manifolded" by means of a pipe to the 4,000-gallon tank, which caused a vacuum to be created that drew the fuel from the smaller tank into the larger one when gas was being dispensed, only the larger tank had to be "dipsticked." Also, it was the practice of the Custers to let the tanks run down to a level of 2 to 3 hundred gallons of gasoline before ordering more. This was because of the Custers' small (6,000-gallon) capacity and Mobil's policy of delivering no less than 5,000 gallons at one time. (RR. 706a–708a) One sees from the record that this practice was varied, however, during the gasoline shortage in the Fall of 1979.

In order to attempt to ascertain the manner in which the purported 3,300 gallons of fuel were lost or stolen from the Custers' garage, Mobil's field engineer (Arnie DiFlorio) water tested the tanks. He did this by placing, with the help of the local fire department, 1,500 gallons of water in each tank on July 18, 1979. Between 12:10 p.m. on the 19th and 8:25 a.m. on the 20th there was a loss of ½ inch of liquid from the 4,000-gallon tank. (RR. 345a) On the 23rd, the tank again was measured and DiFlorio recorded that it had lost 2½ inches of liquid and that it was a "leaker." (RR. 345a) As for the 2,000-gallon tank, there appeared to be no loss of water. (RR. 364a) Nonetheless, DiFlorio advised the district office that because the 4,000-gallon tank "was possibly a leaker and due to the age of the tanks [25

to 30 years old] they ought to be removed." (RR. 348a & 366a)

It is interesting to observe that as far as Mobil's field engineer viewed the situation, the loss of water from the 4,000-gallon tank "could have been a seam [or] a faulty stick reading." (RR. 346a) However, he cautioned that it was "unlikely" that a loss of 2½ inches would be the result of "a faulty stick reading." (RR. 346a) Rather, it was plausible that, just as "the heaviness of the water [*vis-a-vis* the gasoline] might cause the tank['s seams] to expand and open up ....[,] if you put 3,300 gallons of gasoline in [the 4,000-gallon tank] ... [i]t would have the same effect[.]" (RR. 347a) Such was DiFlorio's position, which was consistent with the recollection of Leroy Huggins, Mobil's senior claims adjuster. Mr. Huggins remembered going to the Custers' garage one month after the initial series of tests and talking to DiFlorio, Russell Custer and Bob Young of the Department of Environmental Resources. Although he could not pinpoint the exact time and place, nevertheless, Huggins recalled hearing statements that became the subject of certain notes produced as a normal course of his job. The relevant portion of the notes were presented at the hearing and read:

A 2,000-gallon tank had already been removed/replaced. DiFlorio water tested the 2,000-gallon tank over a one-month period and it showed no loss. However, this tank and a 4,000-gallon tank are manifolded together and testing showed approximate loss of one foot, three and five-eighth inches over same period of time for the 4,000-gallon tank. (RR. 374a)

Huggins also made reference to the notes he compiled after riding around the neighborhood (Oaks, Pennsylvania) where the purported loss/theft of fuel took place. This ride encompassed the nearby Sunoco and Arco stations, which were situated a few blocks away and uphill from the Custers' Mobil station. The Mobil station was located between the aforementioned stations and the homes of the complainants who subsequently filed suit in common pleas

court against Mobil and the Custers for damages caused to their property. These November 30, 1979 reports of the witness provided:

> After riding around the area and locating both the Arco and Sunoco service stations, we [—i.e., Huggins and a Carl Leon Simpson, an expert hired by Mobil and employed by Moody and Associates in Meadville, Pennsylvania, to investigate the problem—] concluded it is doubtful that these two locations are responsible for the contamination due to the distance from Custers' Garage. SU11 ☼ (RR. 385a)

Huggins unhesitatingly remarked that the text of the conversation between himself and Mr. Simpson, which is reproduced *supra*, was "accurate as written." (RR. 386a)

Regressing for a moment from the sequential reconstruction of the facts, I wish to mention that the two tanks were removed on August 22, 1979, and all of the individuals who visually inspected them agreed that the only hole appeared to be near the top of the 4,000-gallon tank and ranged in size from a silver dollar to a quarter of an inch. (RR. 330a, 336a, 349a, 373a, 380a, 524a & 554a) Those individuals who testified as to the condition of the 4,000-gallon tank described it as being rusted and pitted with corrosion. (RR. 350a, 525a, 530a & 554a) In fact, the representative from the Department of Environmental Resources (Robert O. Young) characterized it as being in "poor shape, fair to poor shape." (RR. 524a) Further, on his re-cross-examination, DiFlorio acknowledged that even if one were to give a "careful" examination to the tanks, "it's possible you wouldn't see the holes that caused ... a leak[.]" (RR. 368a) Additionally, in response to appellees' counsel's inquiry as to whether these "pin holes" could open up and gasoline could leak out because of the pressure exerted by the fuel against the walls of the 4,000-gallon tank, DiFlorio answered that it was a "[p]ossibility." (RR. 350a)

The effects of the gasoline contamination started to surface when some of the residents on Egypt Road and Perkiomen Avenue in Oaks, Pennsylvania, the homes of which are

located down hill (RR. 735a) and on either side of Custers' Mobil garage (RR. 432a), began noticing a change in the quality of their well water (some stated it was an odor of "gasoline")[2] as early as November of 1978. (RR. 544a) This prompted the filing of complaints with the Pennsylvania Department of Environmental Resources (DER), which, in turn, commenced the sampling and testing of the well water at 18 separate locations in the Oaks area and in proximity to Custers' Mobil garage, some of which even occurred before the reported loss/theft of the fuel at the garage and continued up until the 23rd of July, 1980. (RR. 511a–523a) In particular, of the wells tested on August 22, 1979, it must be remembered that on each of the dates stated not all of the 18 wells were sampled for contaminants, 4 homes indicated "no detection" of gasoline, whereas 4 homes had gasoline infiltration ranging from 1.5 to 20.0 parts per million (ppm). *Id.* Of the homes tested on November 9, 1979, December 18, 1979 and April 3, 1980, 3 were not contaminated, yet 9 had detectable levels totaling anywhere from .8 to 20.0 ppm. Again, samples taken from some of the wells on April 10, 1980 and July 23, 1980 revealed that 10 had no trace of gasoline as compared to 9 registering petroleum pollutants starting as low as .4 ppm and escalating to 13.0 ppm. *Id.*

Although there appears to be no identifiable federal standard regulating the level at which petroleum (gasoline) pollutants can be present in a water supply and still be useable for domestic purposes (RR. 403a–404a), I wish to note the relevant remarks of a DER agent (Robert O. Young) responding, in the form of a letter, to an attorney representing a resident of Perkiomen Avenue. He wrote:

Samples taken from Mr. Bieber's well on May 21, 1979 and July 26, 1979 (sample sheet copies enclosed) show a small amount of petroleum product or organic compound which, because of the low concentration, cannot be characterized precisely as to amount or type; small amount

**2.** (*See* RR. 294a, 295a, 545a, 556a, 572a, 589a, 595a, 603a, 611a, 636a & 643a).

means below 1 milligram per liter. This amount would not be considered an eminent health hazard but would make the water obnoxious to taste or smell and, therefore, unuseable or undrinkable. Any amount of gasoline or petroleum product in the water should label that water as polluted. (RR. 532a–533a)

If anything, the testing by DER revealed that on certain occasions some wells contained no trace of petroleum pollution, whereas other times the level of gasoline ranged from .4 ppm to 20.0 ppm.

An outgrowth of the noticeable change in the water supply, retrieved from wells situated near the Custers' Mobil station, was the filing of complaints in trespass and equity against the appellants in the Court of Common Pleas of Montgomery County, "Civil Action—Law and Equity."

In all of the complaints, three of which contained thirteen counts sounding in negligence, trespass, strict liability and *res ipsa loquitur,* the appellees, Moore et al. (No. 80–01243, filed January 22, 1980), Bieber et ux. (No. 80–04757, filed March 19, 1980), Carlin et ux. (No. 80–05534, filed April 2, 1980) and Whitman et al. (No. 80–12995, filed November 12, 1980), each sought relief in the form of compensatory and punitive damages *and* the implementation of the court's equitable powers to abate and remove a nuisance (gasoline in the well water) by means of "an injunction ... restraining the Defendants[-appellants], their agents, servants and employees from so handling or mishandling gasoline that it enters the source of water of Plaintiffs[-appellees]; ...."

In response, each appellant filed an answer and new matter, the relevant portions of which will be discussed, and, where appropriate, reproduced instantly. For example, although the appellants admitted that Mobil "was the owner of certain gasoline storage tanks located at [Custers'] garage facility ...[,]" neither would acknowledge that:

On or about August 15, 1979 [—in regard to Moore et al. and Whitman et al., and on or about October 27, 1979 as to Carlin et ux.], and possibly before that date, and

possibly subsequent to that date, continuing to the present, the Defendants have caused or permitted gasoline to leak, spill or otherwise escape from the storage tanks located at Defendants CUSTER'S and CUSTER'S, INC. garage facility at 1161 Egypt Road and flow through the ground into the underground wells owned and used by the plaintiffs. (*See* Count I, Point 7 of Moore's, Whitman's and Carlin's complaint)

Likewise, the appellants denied the Bieber's allegation, in Count I, Point 9 of their complaint, that:

Prior to and on about the said 15th day of August, 1979 Defendants neglected and refused to keep said underground gasoline tanks and their appurtences [sic] thereto at 1161 Egypt Road and near the premises occupied by the Defendants in good and sufficient repair and in a safe condition and by reason of the Defendants said negligence and by reason of the fact that on or about and before the last mentioned date, Defendants, their agents and servants acted carelessly in and about maintaining said gasoline storage tanks, and as a consequence said tanks due to rust and decay, burst, leaked, spilled or broke and the gasoline contained within escaped and was, for a considerable space of time, allowed to leak its course and flowed out of said tanks into the said premises occupied by Plaintiffs, doing serious damage to said premises, its well water becoming contaminated by the said gasoline, rendering the water objectionable and offensive to the senses and useless for domestic consumption and damaging said health of Plaintiff and family and said premises, both real and personal property.

Additionally, both denied, as conclusions of law, appellees' allegation that the escape of the gasoline stored in the tanks resulted from their (Mobil's and Custers') "recklessness, negligence and carelessness" in failing to "inspect," "maintain," "supervise," "correct," "recover and control the gasoline after the spillage, leakage and loss at [Custers' Mobil garage] ... so as to prevent its escape into the ground and thereby contaminate Plaintiffs' water supply."

This same response covered appellees' claim that the Custers did not maintain proper and adequate records of gasoline supplies to alert them of the loss of gasoline, and the attendant harm visited upon the appellees. In the remaining portion of Mobil's and Custers' answer, each denied liability and the concomitant payment of damages under any theory of recovery. Each averred that no gasoline had escaped from the tanks in question and invaded the appellees' properties so as to contaminate their water source.

Furthermore, in the new matter section of appellants' response to appellees' complaints, each sought "indemnification" from the other on principles of implied and/or express indemnity (Mobil) or precepts of trespass and assumpsit (Custers) "for any damages [either] may suffer on account of the occurrences mentioned in the [appellees'] Complaint[s]."

On November 21, 1980, upon "Petition For Mandatory Injunction" and affidavit attached, counsel for the appellees each demanded, *inter alia:*

(a) That Defendants be restrained and enjoined from further polluting the Plaintiffs' wells; (b) that a mandatory injunction be issued ordering Defendants to go upon the Plaintiffs' land and gather, capture, filter, or otherwise remove from Plaintiffs' wells the gasoline found therein in such a manner as not to cause further damage to Plaintiffs' properties; (c) that Defendants, upon proof of same, be ordered to pay an amount of money necessary to place Plaintiffs' land in the condition that it was prior to the improper conduct of Defendants to pay any amount of money necessary for the replacement and/or repair of Plaintiffs' properties and to pay a reasonable sum of money to Plaintiffs for Plaintiffs lose [sic] of use and enjoyment of said land; (d) that Defendants upon proof of same, be ordered to pay an amount of money reimbursing Plaintiffs for all costs and expenses including a reasonable attorney fee for the expenses they have incurred as a result of Defendants' conduct; (e) such

other relief as the Court deems proper and just under the facts as presented.

Prior to examining what transpired at the February 6th, 9th and 10th injunction hearing of 1981, it is appropriate to recap what preceded it.

Counsel for the appellees obtained a court Order on December 16, 1980 setting January 5th of 1981 as the time "to determine whether or not a mandatory injunction w[ould] issue as prayed in the Petition pending a final hearing in th[e] matter." During this same time period, i.e., December 22, 1980, a Praecipe For Civil Trial List, bearing the signatures of counsel for both sides, was filed and provided that "the case [was] in all respects ready for trial;" but reserved by agreement of counsel "that discovery [could] continue until the case [was] listed for trial." A review of the record discloses that interrogatories filed on behalf of appellants-Custers were answered by Carlin et ux. and Bieber et ux. on January 23, 1981 and August 21, 1980, respectively. Additionally, the Custers, DiFlorio, Huggins and the operators of the Sunoco and Arco stations, which are situated up hill from the Custers' Mobil garage, were all deposed prior to the February, 1981 injunction hearing, which was a rescheduled date originally set for January of 1981.

At the beginning of the February 6th proceeding, counsel for Carlin et ux. remarked that inasmuch as the four cases had "just about the exact same proofs," counsel for the appellees Moore et al. and Whitman et al. would be handling the direct and cross-examination of most of the witnesses.

In his opening statement, appellees' counsel outlined their position to be one of claiming that their "wells had been polluted with gasoline." In an effort to ascertain the parties responsible for the contamination, counsel observed that, "[w]e have taken some rather extensive discovery" and authorized, along with the defendants-appellants, the preparation of a report by experts that involved "extensive surveying." (RR. 289a) Counsel then noted that the appellees "had enough evidence to go in ... Court and ask for

the equitable relief ... [sought.]" (RR. 290a) Also, there was a consensus among all concerned that the proceeding would deal with whether the Chancellor at that time could grant the "mandatory preliminary injunction" (RR. 824a) and not the calculation of damages desired by the complainants.

During the 3 days of testimony that generated a voluminous transcript on appellees' request for a preliminary injunction, the Chancellor sitting in Equity heard from 21 witnesses, including the complainants, and received 18 exhibits into evidence.

As touched upon previously in this Dissenting Opinion, all of the appellees that appeared were consistent in their accounting that their well water not only was unpalatable, and thus not ingested, but emitted a pungent odor (characterized by some as "gasoline") despite the installation of charcoal filtration or water softeners in some of the homes. (RR. 587a, 604a & 646a) Consistent therewith, samples of the well water, taken by the complainants from their residences the morning of the hearing, were produced and were still odoriferous. (RR. 575a, 584a & 649a) Thus, the water was restricted in application to those functions that minimized or eliminated contact with the body, for some appellees complained that the after effects of itching, dry skin, hives (RR. 303a, 613a & 645a) and the persistence of odor (RR. 310a & 645a) discounted its use for things other than flushing toilets and the washing of clothes or cars. Also, because of the high concentration of iron and manganese in the water, porcelain, dishes and faucet fixtures became stained. To cope with the situation, a few of the complainants had to resort to the purchase of elaborate equipment or potable water, while others relied upon their friends or relatives for their sources of water. (RR. 305a–306a, 574a, 590a, 596a & 613a)

Evidence concerning the source of the pollutants came from a variety of witnesses, e.g., DiFlorio (who labelled the 4,000-gallon tank a "leaker") and Huggins (who reaffirmed the loss of liquid from the 4,000-gallon tank during testing,

as well as admitting to perforating the surface of the tank, without effort, with the use of a car key), both of whom are employees of Mobil. (RR. 345, 375a & 378a) But, the most incisive look at the question was through the eyes of the experts. For the appellees, this was Dr. John Russell Ousey, Jr., assistant professor of environmental science at Pennsylvania State University, Delaware campus. Dr. Ousey was employed by Betz, Converse and Murdoch, Inc. (which was hired by the complainants) to collect samplings from the complainants' wells and draw conclusions premised upon the tests conducted thereon. In doing so, Dr. Ousey felt that granted he could not say for sure whether the 3,300 gallons of fuel at "Custer's Garage" was lost at one time or over a long period, nonetheless, based upon the testimony heard in court and the data gathered through his own investigation, he "d[id] believe that there was gasoline coming from this source." (RR. 487a) This conclusion was prefaced by an exchange between counsel for the appellees and Dr. Ousey, which went as follows:

Q   Can you tell us what that opinion is? What you base it upon.

A   Based upon the information that was provided to me by you which was basically the materials regarding the apparent or possible leak from a gasoline tank, given the topography, the attitude of the bedding, the results of the ground water samples, the distribution of the concentrations and the water table contour map, I believe that the source of the gasoline in those wells is the alleged leaking tanks at the Custer Gas Station.

Q   Now, did you consider any other sources as the possible source of this pollution?

A   Well, when we went out there, he [Carl Leon Simpson, Mobil's retained expert] pointed out two other gas stations in the area that had to be considered certainly as possible sources. These other gas stations were located along Egypt Road. The symbol on here for ARCO, it is one of those two buildings, I guess it really doesn't matter which one from the standpoint of what I

have to say about it—and I believe that's the location of the Sunoco station down there, too, on—I know it's that road, I'm not exactly sure which block it was in, that's all. Based on the assumption and my belief that this is an unconfined aquifer system and that it would conform to the—that is, the water table would conform to the regional pattern of topography, I do not believe that it's possible for gasoline to flow basically across a ground water divide in this case to this area that has the gasoline problems.

*   *   *   *   *   *

So I considered that possibility that it could be another gas station in the area, but I do not believe that it could be either Arco or the Sunoco station based upon the consideration of the terrain and from that the assumed water table. (RR. 418a–419a & 420a)

Dr. Ousey also testified that although "fingerprinting," the ability to identify a particular company's gasoline because of the properties added by that company during production, was not possible because the product had "degraded to the point where a positive identification could not be made except ... that it could not have been Sun Oil Station." (RR. 476a)

It cannot be disputed that Carl Leon Simpson, the expert hired by Mobil to conduct his own investigation of the wells involved and make findings therefrom, took issue with some of the conclusions drawn, as well as the underlying rationale thereto, by Dr. Ousey. However, as will become evident from the succeeding dialogue among the Chancellor, Mr. Simpson and appellees' counsel, Dr. Ousey's opinion that "Custer's Garage" was the derivation of the gasoline leak has credence; to-wit:

BY THE COURT:

Q  Mr. Simpson, assuming no intentional pollution of these wells, taking the Larsen property, what explanation do you have of the presence of gasoline in the Larsen well?

[MR. SIMPSON:]

A  I'm sure the presence of the gasoline is that there is gasoline in a dissolved fashion in that ground water at that location, that it is a subsurface pollution effect.

Q  Is it possible that that could have come from anything other than a spill or leak?

A  You mean as a natural occurring phenomenon?  Gasoline is a refined product.

Q  I'm assuming no intentional pollution of a well or intentional pollution of the surrounding area, is there any other explanation for the presence of gasoline in that well apart from another gasoline spill or a gasoline leak?

A  Not in my opinion.

Q  Then do you have any idea where this gasoline came from?

A  Not at this time.

Q  Apart from some service station?

A  Not at this time.

Q  Would it be fair to say that then it came from some service station?

A  I would say so.

Q  And there is [sic] three service stations in the area, right?  ARCO, Sunoco and Mobil, correct?

A  That's correct.

Q  So is it far [sic] to assume it came from one of them.

A  I would think so.

---

BY MR. TURETSKY [Appellees' Counsel]:

Q  You were here when Mr. Huggins testified, is that correct, Mr. Simpson?

A  That is correct.

Q  And we went over some of the notes that he prepared and in one of them, you recall that after you had been in the area, that you eliminated the ARCO and the Sunoco stations as being a possible source of the gasoline, is that correct?

A   I don't know if I eliminated it.  I think I said that, you know, that just based on a circumstantial drive through, that the Mobil station was the closest.

Q   And that drive through also involved looking at the topography where the hills are and so forth?

A   What was the date of that correspondence?

Q   It's 11–30–79.

A   That would be at the time of the initial site visitation, if you will.

Q   Mr. Huggins' notes are—he is referring to "he", that's you, "he concluded that it was doubtful that these two locations, that's the ARCO and Sunoco station, are responsible for the contamination due to the distance from Custer's garage, and also the fact that no house in between have reported well problems."  Is that basically what you said?

A   Yes.

(RR. 813a–815a)

At the completion of Mr. Simpson's questioning, the hearing came to a close, and, as referred to by the Chancellor in his Opinion, "the issuance of ... [a preliminary] injunction did not appear to be an efficient device to accomplish th[e] purpose [of giving the appellees] ... prompt relief."

As a result of the Chancellor's decision to issue no preliminary injunction, and because of the parties failure after the passage of a week to devise a plan that would assure the complainants clean water, the case was set down for a "final hearing" on March 13, 1981, to consider the issuance of a permanent injunction.  (RR. 960a–961a) Thereafter, counsel for the appellants filed various motions (for discovery, for a continuance of 120 days, for dismissal of the preliminary injunction and for clarification of the Order setting the March 13th hearing).  All were denied by the Chancellor.

After the March 13th hearing, at which only Russell A. Custer appeared on behalf of the appellants, the Chancellor issued findings of fact and conclusions of law in support of

his Decree Nisi "permanently enjoin[ing]" the appellants "from polluting the ground and the ground water in and about the vicinity of the [appellees'] wells." To that end, the appellants also were ordered to implement whatever measures were necessary to assure that the gasoline and other contaminants in the soil and ground water, as a consequence of the leakage from Custers' tanks, did not continue to pollute appellees' wells. Thus, a comprehensive plan to mitigate the long term effects of this insidious type of contamination was to be jointly prepared and submitted to the Chancellor for approval within a specified time. In the interim, however, the appellants were to provide the complainants with an alternative supply of safe and potable water for domestic use. Also, a request for a stay of the injunction was denied.

Of more than 300 exceptions filed by the appellants, nine have been raised on appeal.[3] They shall be dealt with in *seriatim.*

Before addressing the first claim, I wish to mention that my review of the extensive record and law supports a finding that Mobil and/or the Custers are primarily responsible for the discharge of gasoline into the well water situated under the Egypt Road and Perkiomen Avenue area in Oaks, Pennsylvania.[4] Thus, such a determination by the

3. Jurisdiction to hear this dispute appears in Pa.R.App.P. 311(a)(4); *see also Ezy Parks v. Larson,* 499 Pa. 615, 454 A.2d 928 (1982).

4. The record indicates that the Custers were merely leasing the tanks in question from Mobil. (RR. 1154a) Under separate agreement, the Custers were imposed with the obligation of keeping the "equipment" in good operating condition, whereas Mobil, upon notification by the Custers, was then to make what it determined to be needed repairs "to keep the equipment in good operating condition." *Id.* The Chancellor noted that the issue of ultimate allocation of liability was not before him. Nor is that issue before this Court, and, thus, no view on it need be expressed.

Notwithstanding such a fact, I wish to point out that since the installation of the tanks in question, the smaller 2,000-gallon one in 1953 and the larger 4,000-gallon one in 1961 (RR. 382a), neither appellant has ever tested nor inspected them for defects. *See Philadelphia Chewing Gum Corp. v. Commonwealth of Pa., Dept. of Environmental Resources,* 35 Pa.Cmwlth. 443, 463, 387 A.2d 142, 152 (1978)

Chancellor and the court en banc is not, as the Majority would have us believe, a "clearly speculative" finding of fact. (Majority's Opinion at 1019) *Cf. A.H. Grove & Sons, Inc. v. Commonwealth of Pa., Dept. of Environmental Resources,* 70 Pa.Cmwlth. 34, 452 A.2d 586 (1982) (The Department conceded that the evidence supporting the finding that Grove's property housing the storage tanks and waste oil was logically the most probable source of the contamination in the affected wells was circumstantial in nature. Nevertheless, the appellate court decided that the evidence was substantial and competent). Having said that, I will examine appellants' allegation that the court below erred by acting in equity.

In particular, the appellants assert that the appellees were not entitled to any equitable relief since legal relief would serve to compensate them, even assuming that they were entitled to compensation, i.e., "an award of damages" to "have new wells dug or ... whatever remedial action was necessary ...." Thus, they urge, there was no need for the court below to act in equity at all because "[t]here were no continuing acts for the court below to enjoin." I disagree.

Initially, I wish to point out that the well-pleaded complaints indicate the propriety of proceeding in a court of equity, *see Carelli v. Lyter,* 430 Pa. 543, 244 A.2d 6 (1968), for such a tribunal is vested with the jurisdiction to hear the claims raised therein. *See* The Clean Streams Law, Act of

("While the record presently before us does not reveal when, or even if, Rogers came to have knowledge of the pollution problem created by one of their tenants, we believe that Rogers should have known of the existence of this condition on their land. Rogers, as owners, have suffered this condition to continue for over twenty years. They have collected rent from [their tenants] for over thirty years.... Thus, we believe that Rogers, over the course of twenty years, have sufficiently associated themselves with the existence of this condition to render reasonable their participation in its abatement."), *aff'd sub. nom. National Wood Preservers, Inc. v. Commonwealth of Pa., Dept. of Environmental Resources,* 489 Pa. 221, 414 A.2d 37 (1980). *Accord Lerro v. Wynne, Inc.,* 451 Pa. 37, 301 A.2d 705 (1973).

Also of interest is the fact that the cost of removing the two tanks was borne equally by the appellants. (RR. 977a–978a)

June 22, 1937, P.L.1987, art. VII, § 701; 35 P.S. § 691.701. As a corollary thereto, it has long been established that the jurisdiction of a court in equity may not be invoked where there is an adequate remedy at law. *Borough of College-ville v. Philadelphia Suburban Water Co.*, 377 Pa. 636, 105 A.2d 722 (1954). However, an action for damages, as the appellants urge the Court to find available to the appellees after they (appellees)[5] ameliorate the situation, is an inadequate remedy when there is no agreement, even between the experts for both sides, as to the time-frame within which the problem will be resolved or a course to follow to remedy the situation in the long-run. In other words, no one has indicated the nature of the injury caused by the nuisance, i.e., permanent or temporary. Such a determination impacts upon the measure of damages recoverable by a litigant. *See* Sedgwick, Theodore, A Treatise on the Measure of Damages, Vol. III, § 947; Sutherland, J.G., A Treatise on the Law of Damages, Vol. I, § 2150. This, in turn, affects the ability of an aggrieved party to calculate damages reasonably. On this matter, the treatise writers concur that:

> In an action for damages, the plaintiff must prove, as part of his case, both the amount and the cause of his loss. Absolute certainty is not required, but both the cause and the probable amount of the loss must be shown with reasonable certainty.

Hall, Handbook on the Law of Damages, § 31 at 99; Sedgwick, Theodore, A Treatise on the Measure of Damages, Vol. I, § 170 at 317–318 ("A party who claims compensation for a legal injury must show, as part of his case, that he has suffered a loss through the injury; and the burden of proving what loss he has suffered is upon him. He is to show, with that *reasonable certainty* required by the law, the nature and extent of the loss for which he is entitled to compensation; and no recovery can be had for any damages which is not satisfactorily proved by the evidence." (Em-

**5.** Mobil and the Custers want the complainants-appellees to absorb the initial expense in remeding the situation and then seek recoupment in the form of damages in a law suit against Mobil and the Custers.

phasis added)); Sutherland, J.G., A Treatise on the Law of Damages, Vol. I, § 75 at 59–60 ("... the rule ... necessitates proof of actual damages ... by some data upon which to base ... [recovery] being shown with *some reasonable certainty* where the damage is susceptible of proof; ... in ascertaining the extent thereof they should produce the best evidence in their power as to the amount of the loss sustained by them." (Emphasis added)).

I do not in any way wish to imply that the parties cannot avail themselves of the law side of the Court of Common Pleas of Montgomery County. Rather, my argument goes to the Majority's curtailments of the equity court's authority in the instant situation from formulating a viable interim measure of relief for the homeowners during a period of assessment by the litigants as to which avenue to pursue in remedying the nuisance once and for all. Since this matter is in dispute, the Chancellor, I believe, acted properly in ordering Mobil and the Custers to provide the plaintiffs with an alternative source of water until the matter could be finally decided.

Granted that the tanks have been replaced, and, thus, *that* conduct has ended, nonetheless, the condition adversely affecting the water supply lingers on (*see, e.g., Commonwealth v. Barnes & Tucker, Co.*, 472 Pa. 115, 371 A.2d 461 (1977); *Philadelphia Chewing Gum Corp. v. Commonwealth of Pa., Dept. of Environmental Resources*, 35 Pa.Cmwlth. 443, 387 A.2d 142 (1978)) and the solution is an open question. As stated by Dr. Ousey, the contamination "could last for a considerable period of time measured in years .... It will also take a very long time for it to run out with the water table ... because the petroleum tends to adhere to the particules as it moves through [the system]. So there will always be a little bit left until it finally gets biologically degraded. That could be a very, very long process. [He] really could not put a time scale on it ...." (RR. 420a–421a) Appellants' expert could neither confirm nor deny the aforesaid, inasmuch as he had not done any subsurface testing to gauge the speed at which the under-

ground aquifers flowed, but he did offer that, based on the normal current for the topography in the area, the rate of diffusion was slow.

As just mentioned, not only is the time table for the natural purging of the water unclear, but a man-made solution is as equally uncertain.

Appellees' expert proffered two possible measures to abate the problem. The first would require the creation of a cone of depression in the earth's surface that would cause an artificial zone of downgrading into which the contaminants would flow and then be retrieved. This procedure is not without its drawbacks. (*See* RR. 422a) The second alternative is to dig new and deeper wells for each of the appellees. However, as with the first recommendation, there is no guarantee that the deeper wells would be free of contaminants. (RR. 423a) It would be a case by case proposition. A third suggestion came from the appellants, who were of the opinion that the use of filtration systems would remedy the matter. Aside from the fact that this procedure is but a stop-gap measure for a long term problem, it will be recalled that many of the appellees' complained of detecting the odor of gasoline in their water even *after* carbon filtration.

Since the parties, subsequent to the preliminary injunction hearing and prior to the final hearing, were unable to agree upon a workable solution to the problem, it seems ill-advised for the appellees to embark on a course of action, whatever that might be, to rectify the water situation and expose themselves to claims by the appellants that the course pursued was premature and required prior consultation to assess the most feasible plan.

Moreover, one sees that the appellants were held by the Chancellor to be the source of the pollution, and, thus, they are not blameless. *Compare Commonwealth v. Wyeth Laboratories, Division of American Home Products Corp.*, 12 Pa.Cmwlth. 227, 315 A.2d 648 (1974). Therefore, to require or condone the burdening of the complainants with the expense of initiating remedial measures, which most would be unable to afford as evidenced by the testimo-

ny of some at the preliminary hearing, the expense of modifying or eradicating the pollution would be borne by the appellees—"general public" and not the appellants— "polluters." *Cf. Commonwealth v. Coward*, 489 Pa. 327, 336, 414 A.2d 91, 96 (1980) (" 'The modification proceedings must be carried out on the polluter's time, not at the expense of the general public.' ").

Further, since the most efficient manner, or, for that case, some manner, of dealing with the pollution (*see Commonwealth ex rel. Shumaker v. New York & Pennsylvania Co.*, 367 Pa. 40, 47, 79 A.2d 439, 444 (1951) ("... corruption of waterways has long been recognized as both a public and private nuisance."); 35 P.S. §§ 691.1 & 691.3), is still yet undetermined, it cannot be said that the damages can be computed with "some reasonable certainty." *See* Sedgwick, *supra;* Sutherland, *supra;* Hall, *supra.* Consequently, "it is the peculiar province of equity to afford relief where the measurement of damages in such cases cannot be formulated and applied in a suit at law because of their being necessarily speculative and indeterminate, and therefore the legal remedy is not adequate and complete." (Citations omitted) *Strank v. Mercy Hospital of Johnstown*, 383 Pa. 54, 57, 117 A.2d 697, 698 (1955).

I find that the Chancellor did not act improperly in causing the appellants, by means of an injunction,[6] to *submit proposals* for the removal of the hydrocarbons from the groundwater, and, that in the interim, appellees be supplied with "safe and potable water for domestic use."

---

**6.** In reviewing the Chancellor's action in issuing an injunction, the scope of review, as with other types of equity matters, is limited: " '[W]e will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable....' " (Citations omitted) *Community Sports, Inc. v. Denver Ringsby Rockets, Inc.*, 429 Pa. 565, 569, 240 A.2d 832, 834 (1968); *see also New Castle Orthopedic Assoc. v. Burns*, 481 Pa. 460, 463–464, 392 A.2d 1383, 1385 (1978). In applying the standard reproduced *supra*, I find no reason to alter the Chancellor's ruling as to the injunction. *See* discussion *infra*.

*See generally National Wood Preservers, Inc. v. Commonwealth of Pa., Dept. of Environmental Resources*, 489 Pa. 221, 414 A.2d 37 (1980); *Commonwealth v. Barnes & Tucker Co., supra; A.H. Grove & Sons, Inc. v. Commonwealth of Pa., Dept. of Environmental Resources, supra; Philadelphia Chewing Gum Corp. v. Commonwealth of Pa., Dept. of Environmental Resources, supra; Lerro v. Thomas Wynne, Inc.*, 451 Pa. 37, 301 A.2d 705 (1973).

Our courts have "long recognized the power of a Chancellor to shape and render a decree which accords with the equities in the case when, as here, the complainant[s] include[ ] a prayer for general relief." *Salisbury Township v. Vito*, 446 Pa. 200, 204, 285 A.2d 529, 531 (1971). Where "[e]quity had proper jurisdiction in th[e] matter [it] may, under the prayer for general relief, validly frame any proper relief agreeable to the case pleaded and proven." *Sigal v. Manufacturers Light & Heat Co.*, 450 Pa. 228, 231, 299 A.2d 646, 647 (1973). Accordingly, the prayer for general relief in appellees' complaints provides a proper foundation for an order that safe and potable water for domestic use be given to the complainants during the period that a solution to the pollution is being thought out, and, ultimately, implemented. *See Sack v. Feinman*, 489 Pa. 152, 159–160, 413 A.2d 1059, 1063 (1980).

The second of appellants' assertions concerns the purported error committed by the court below in failing to empanel a jury where the appellees sued in trespass and in equity and the damages were not merely incidental to the equitable relief sought.

It is true that the complaints stated both equitable and legal bases for relief. This, however, is not dispositive of the matter.

This Court in *Rosenberg v. Rosenberg*, 276 Pa.Super. 203, 419 A.2d 167 (1980) was confronted with a situation procedurally akin to the one here. In *Rosenberg*, an ex-wife filed a complaint in equity against her ex-husband for his alleged noncompliance with the terms of an agreement. The ex-husband counterclaimed that the ex-wife had not complied with part of the same agreement. This two-count counter-

claim sounded in trespass and assumpsit and requested damages. In response, the ex-wife filed preliminary objections to the counterclaim on the ground, *inter alia,* that she was entitled to have those issues raised by her ex-husband tried by a jury because the action was brought in trespass and assumpsit. The trial court agreed, but on appeal we reversed. We did so for the following reasons:

Article I, Section 6 of the Pennsylvania Constitution does not permit a jury trial in an ordinary equity action. *Schwab v. Miller,* 302 Pa. 507, 153 A. 731 (1931). Thus, it is clear that neither plaintiff, nor defendant has the right to a jury trial on plaintiff's action in equity against the defendant.

\*     \*     \*     \*     \*     \*

The principal [sic] that equity has jurisdiction to do complete justice between the parties is a long established one. *Wortex Mills v. Textile Workers U. of A.,* 380 Pa. 3, 109 A.2d 815 (1954). Moreover, due process problems are inherent in a situation where a chancellor under equitable principles hears the complaint and a jury hears the counterclaim under legal principles where the issues raised in both the case in chief and the counterclaim are the same. Such would be the case in the instant matter as both parties' actions arise out of the same agreement. Furthermore, having two different tribunals rule on the same dispute, could very well result in problems of collateral estoppel, thereby working an injustice to one of the parties. It would also result in a burdensome, cumbersome procedure which would not be in the best interests of judicial expediency and would cause great confusion to lawyers, judges and the parties to the litigation. Article I, Section 6 of the Pennsylvania Constitution does not extend the right to a jury trial where such a right did not heretofore exist. The appellee has failed to cite any cases recognizing this right "heretofore".

*Rosenberg v. Rosenberg, supra,* 276 Pa.Super. at 206–207, 419 A.2d at 168. Instantly, as in *Rosenberg,* "both parties' actions arise out of the same" facts. Thus, I find no reason to quarrel with the rationale in *Rosenberg,* and, in fact,

embrace it. My reliance upon *Rosenberg* is even substantiated by the cases cited by the appellants in their brief, e.g., *Beckert v. Warren,* 497 Pa. 137, 157–158, 439 A.2d 638, 649 (1981), wherein our Supreme Court acknowledged that in a complaint seeking both equitable and legal relief, "[a]ssuming ... that the equitable counts were reached, defendants could then point to no absolute right to factfinding by a jury." [7] Immediately after making such a statement the Court listed the case of *Philadelphia Gas Works v. Philadelphia,* 331 Pa. 321, 1 A.2d 156 (1938). There, the language is even more supportive of the determination that the appellants were not denied the right to a jury trial in the face of a complaint seeking, *inter alia,* relief in the form of an injunction. The relevant portion thereof is as follows:

Nor is there any merit in the other objection that the city has been unconstitutionally deprived of a jury trial. Ample ground appears, as has been shown, for the intervention of equity. It was the acts of the Mayor that required equitable intervention; the solution of the dispute involved a complicated accounting, a subject particularly appropriate for a chancellor (indeed made cognizable in equity by statute) and seldom treated to the satisfaction of either party by a jury. "Equity is the special forum for obtaining an injunction, which may be granted to prevent actual or threatened trespasses or nuisances of a continuing and permanent character * * and, when once the jurisdiction has thus attached, equity will itself proceed to round out the whole circle of controversy by deciding every other contention connected with the subject-matter of the suit, including the amount of damages to which plaintiff is entitled because of injuries theretofore sustained". *Gray v. Philadelphia & Reading Coal & Iron Co.,* 286 Pa. 11, 16, 132 A. 820, 821. "By the Act of February 14, 1857, P.L. 39, (17 P.S. § 283), enlarging section 39 of the Act of June 13, 1840, P.L. 666, 671, 17 P.S. § 286, the courts of common pleas are expressly given equitable jurisdiction in matters of account. This is

7. Such was the case here when the trier of fact-Chancellor rendered his findings of fact.

not affected by article 1, section 6, of the state Constitution, which provides that 'trial by jury shall be as heretofore, and the right thereof remain inviolate.' If the jurisdiction of courts of equity in matters of accounting was held to have been taken away by that provision, and such actions were required to be brought in courts of law, then 'trial by jury' would be extended beyond the realm of the 'heretofore,' and this the Constitution does not require." *Schwab v. Miller*, 302 Pa. 507, 510, 153 A. 731, 733. (Footnotes omitted)

331 Pa. at 358–359, 1 A.2d at 173. I believe that no more need be said than that already articulated in *Philadelphia Gas Works* and *Rosenberg* in regard to appellants' jury trial argument.

Since the appellants' third and fifth points turn upon the propriety of the March 13, 1981 *final* injunctive hearing, the legitimacy of which will be addressed in response to the fourth issue raised, I will not specifically treat them in light of the disposition made.

Appellants complain that the Chancellor *sua sponte* directed that the March 13th proceeding be a "final hearing for injunctive relief," and, over their objection, they were denied the opportunity to seek additional discovery prior to the scheduled proceeding. As to the unilateral action of the Chancellor, although an examination of the Pennsylvania Rules of Civil Procedure discloses no designation as to when a final hearing must be held subsequent to the grant of a preliminary hearing on a request for an injunction, *see Duggan v. 807 Liberty Avenue, Inc.*, 447 Pa. 281, 290, 288 A.2d 750, 755 (1972), the Rules do require that a final hearing be set "upon demand" and not by the court *sua sponte. Cf. School District of Pittsburgh v. Pittsburgh Federation of Teachers*, 486 Pa. 365, 374, 406 A.2d 324, 328 (1979) ("... a final hearing was required, upon demand, by Rule 1531(f)(1) after the issuance of the preliminary injunction ...."); *Hatalowich v. Bednarski*, 315 Pa.Super. 303, 461 A.2d 1292 (1983) (Trial court lacks authority to enter an order of non pros *sua sponte*); *Edward M. v. O'Neill*, 291 Pa.Super. 531, 436 A.2d 628 (1981) (The lower court was in

error in issuing an injunction *sua sponte* ). This procedural irregularity was preserved by inclusion in the exceptions filed by Mobil to the Chancellor's Decree Nisi. Pa.R.Civ.P. 1518.

Additionally, this impropriety accelerated the time within which a final hearing was to be held and had a direct impact, as evidenced by the Chancellor's issuance of a protective order, in denying Mobil further access to discovery and the deposing of witnesses that *may* have prejudiced its case. For us to ask, "What more could counsel for the appellants have asked of the appellees that was not already inquired about at the preliminary hearing?" [8] would be to engage in pure speculation. This we will not do, for we cannot and should not relitigate the case on appeal and, in essence, act as appellees' advocate. *Cf. Commonwealth v. Walls,* 481 Pa. 1, 5, 391 A.2d 1064, 1066 (1978) (Dissenting Opinion by MANDERINO, J.) ("We should not act as attorneys for the Prosecution and find new issues unless we do the same for the appellant. [Citation omitted].").

Notwithstanding this *sua sponte* court action, which resulted in the presentment of but one witness by Mobil to support its position and the Chancellor's language treating the March 13th hearing as final, I disagree with the appellants as to the nature of the injunction granted. I do so on the basis that:

> First, we must determine whether the lower court's decree was in the nature of a preliminary injunction or a permanent injunction. The label attached by the trial court, to the proceedings and the relief resulting therefrom, is not controlling in determining whether the proceedings were for a preliminary injunction or a permanent injunction. *See Walker v. O'Bannon,* 487 F.Supp. 1151 (W.D.Pa.1980), affirmed 624 F.2d 1092 (3rd Cir.) (1980).

*Naus v. Newlyn, Inc. v. Mason,* 295 Pa.Super. 208, 211, 441 A.2d 422, 424 (1982). In other words, regardless of the

---

**8.** The individuals sought to be deposed by the appellants included the appellees and those gas station owners nearby the "Custer's Garage."

language employed by the Chancellor in resolving the matter, it must be considered a temporary injunction as sought initially by the appellees. *See Township of Clinton v. Carmat, Inc.,* 288 Pa.Super. 433, 432 A.2d 238 (1981).

The purpose of a preliminary injunction is to preserve the status quo as it presently exists or existed before the acts complained of, and, thus, temporarily prevent irreparable injury or gross injustice. *Duggan v. 807 Liberty Avenue, Inc., supra.* Reviewing the Order of the Chancellor, I find that it did not go beyond preserving the status quo, and, therefore, the relief granted was *ad hoc* in nature. For example, the requirement that the appellants provide the appellees with an alternative water supply for domestic use "is in the spirit of a temporary injunction as it is a stop-gap measure designed to allow for further detailed proceedings." *Naus & Newlyn, Inc. v. Mason, supra,* 295 Pa.Super. at 212, 441 A.2d at 424. Thus, since the appellees only wanted the situation as it "existed before the acts complained of," to require them to incur the expense of securing water for domestic use would be a "gross injustice," especially as to those who had testified to being financially unable to incur the cost.

The record, as it stood at the time of the granting of the Order, satisfactorily supports the conclusion that the issuance of a preliminary injunction was proper.[9] I, therefore, would affirm the Order granting the (preliminary) injunction to the extent that it finds the appellants primarily liable and for the requirement that they provide the homeowners with an alternative water supply until a workable solution can be reached between the parties to eradicate the problem at hand.

9. This conclusion dispenses with the need to examine appellants' Points VIII & IX, which assail the sufficiency of the evidence to sustain the entry of the preliminary injunction. However, as for appellants' Point VI, we are in agreement with the Chancellor's ruling that the testimony of Messrs. McDermott, Francis & Robbins was irrelevant, based upon hearsay or too remote in time in regard to content to be admitted at the preliminary hearing. (*See* ORDER SUR EXCEPTIONS 8/21/81 at 2) I also join the Chancellor in his conclusion that there was no material variance between appellees' pleadings

Moreover, although the Chancellor acted improperly in *sua sponte* conducting a hearing that was captioned "permanent" in nature, this in no way precludes an appellate court from " 'examin[ing] the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that *no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied* will we interfere with the decision of the Chancellor.' " (Citations omitted) (Emphasis in original) *Ezy Parks v. Larson,* 499 Pa. 615, 619, 454 A.2d 928, 930 (1982). Having determined that the "preliminary" injunction is supported by the facts, as well as the law, I see no reason to penalize the homeowners by requiring them to absorb the expense of securing an alternative water supply during the time that this matter is pursued through the courts.

Accordingly, I dissent to the Majority's manner of handling the case at bar.

and the proof presented at the hearing. *Id.* at 3–4. Lastly, any other issue that was not dealt with by this writer is determined to be the proper subject of any future appeal that may arise out of the possible issuance, "upon demand" by a litigant, of a permanent injunction below.